Cherry Ann **PEGUES**, Plaintiff,

v.

**EMERSON ELECTRIC CO. and Greg Mosley, Defendants.**

No. 3:94CV119–S–D.

United States District Court, N.D. Mississippi, Western Division.

Jan. 25, 1996.

Lawrence Hakim, Charlie Baglan & Associates, Batesville, MS, for Plaintiff.

Kenneth Milam, Watkins & Eager, Jackson, MS, for Defendants.

## OPINION

SENTER, Chief Judge.

In this case, plaintiff alleges that defendants wrongfully terminated her employment in violation of the Americans with Disabilities

Act (ADA) and state law. Presently before the court is defendants' motion for summary judgment.

## FACTS

The plaintiff, Cherry Ann Pegues, began working for defendant Emerson Electric Company in 1972, and worked at that company until she was terminated in December, 1993. This was Pegues' first and only job; she has an eighth-grade education and no GED.

In September, 1992, Pegues received a work-related injury, which was subsequently diagnosed as bilateral carpal tunnel syndrome. At the time, she reported her injury to her supervisor and to defendant Greg Mosley, who was the personnel manager of Emerson's Oxford, Mississippi, manufacturing facility. A week later, Emerson sent Pegues to see a doctor who released her for light duty work. Because her recovery was progressing slowly, Pegues decided to seek treatment from another doctor who relieved her from any kind of work from November, 1992, until January, 1993. In early January, Pegues' doctor allowed her to resume working, and she returned to her previous job of scoping rotors. Within a few weeks, however, she returned to the doctor complaining of continuing pain in her hands, and, once again, he relieved her of her job duties. Her doctor continued to monitor her condition, keeping Emerson informed, and in June and September, 1993, he performed surgery on Pegues' hands.

In November, 1993, Pegues received a letter from a nurse who worked for Emerson's workers' compensation administrator. It indicated that Pegues' doctor had released her to return to work, which Pegues did the following day. At that time, she met with Mosley, who advised her that her old job of scoping rotors was not available and that she was therefore being placed in the diecast loader/unloader position, a job which Pegues' doctor believed she was able to do "without any necessary restrictions or limitations." For two and one-half days, Pegues attempted to perform her assigned duties but began to experience pain in her hands and shoulder. She reported the problems to her supervisor

who advised her to talk to Mosley, who was unavailable. Following the Thanksgiving holidays, Pegues returned to her doctor after notifying Emerson of her appointment. The doctor once again relieved Pegues of her work duties, advising her that he would notify Emerson of his actions. Pegues had no further contact with Emerson until approximately two weeks later when she received a certified letter from Mosley stating that she had been terminated a week earlier for failing to report her absence. In this situation, the employee, according to Emerson, was presumed to have voluntarily quit her employment. Pegues then called Mosley. He denied having received any notification from the doctor but stated he would investigate the matter. A week later Pegues received another certified letter from Emerson advising that its decision to terminate her employment remained unchanged, as it was the duty of the employee, not the doctor, to contact the company about medical leave.

Subsequently, Pegues brought this action for violations of the ADA and the Mississippi Constitution and for wrongful discharge and negligent and intentional infliction of emotional distress. In separate proceedings, she also sought disability benefits from the Mississippi Workers' Compensation Commission and the Social Security Administration. At Pegues' hearing before the workers' compensation administrative judge, she testified that although she has been released to return to work, she remains in pain, is unable to do any housework, and continues under her doctor's care. Her rehabilitation consultant, C. Lamar Crocker, opined that, given her injury and the restrictions placed upon her by her doctor, Pegues is not employable and probably never will be; he therefore assigned her an occupational disability of one hundred percent. In reaching his conclusions, Crocker discounted Pegues' limited education as follows:

> [I]t doesn't matter whether you're educated or not. If you're a skilled, semi-skilled, or unskilled person, in whatever job you're using, if you can't use your hands, even in the simplest thing of just grasping something and holding onto it and moving with it—that is the simplest of the three. If

you can't do that, it's major. . . . When [her doctor] told me that she could not grasp simply, that she was not capable of pushing or pulling, nor could she do what we call fine manipulation, in other words, of manipulating the fingers for assembly work, piecework—when you put all three of those factors together, you're basically finding out the doctor is saying she can't use her hands period.[1]

Emerson presented no evidence to rebut any of Pegues' evidence. Therefore, based upon the testimony of Pegues and Crocker and that of Pegues' doctors, the administrative judge found that since September, 1992, Pegues has been permanently and totally disabled with a total loss of wage-earning capacity.

Pegues also received a favorable decision on her claim for social security disability benefits after a hearing before the administrative law judge. The ALJ concluded that Pegues' "impairments preclude her ability to perform significant numbers of jobs existing in the national economy." More specifically, he found that she (1) "is unable to perform a full range of work, even at the sedentary exertional level," (2) "is unable to perform her past relevant work as a small part assembler or inspector," (3) "does not have any acquired skills which are transferable to the skilled or semiskilled activities of other work," and (4) "cannot be expected to make a vocational adjustment to work which exists in significant numbers in the economy." In sum, Pegues "has been under a 'disability,' as defined in the Social Security Act, since January 22, 1993. . . ."

This cause is presently before the court on the motion of Emerson and Mosley for summary judgment. In it, they argue that because Pegues cannot raise a genuine issue of material fact as to whether she is a qualified

individual under the ADA, she therefore cannot state a prima facie case of discrimination. They also argue that even if she makes that showing, summary judgment is appropriate because they have articulated a legitimate reason for the termination. As to the state law claims, Emerson and Mosley maintain that Pegues was an at-will employee and could be discharged at any time and that her emotional distress claims fail as a matter of law. Mosley further contends that he cannot be held individually liable under the ADA because he was not an "employer" as defined in the statute or under state law as he was not a party to the employment relationship between Pegues and Emerson and because in advising Pegues of her termination, he was simply discharging his employment duties with Emerson. Each of these grounds and Pegues' responses will be considered in turn.[2]

## DISCUSSION

### I.

The Americans with Disabilities Act prohibits discrimination against qualified employees with a disability "because of the disability. . . ." 42 U.S.C. § 12112(a). To state a prima facie case under the ADA, plaintiff must prove that (1) she suffers from a "disability"; (2) she is a "qualified individual"; (3) she suffered an adverse employment action; and (4) she was treated less favorably than nondisabled employees. *Daigle v. Liberty Life Insurance Co.*, 70 F.3d 394, 396 (5th Cir.1995); *Aikens v. Banana Republic, Inc.*, 877 F.Supp. 1031, 1036 (S.D.Tex.1995); *Stradley v. Lafourche Communications, Inc.*, 869 F.Supp. 442, 443 (E.D.La.1994). On summary judgment, plaintiff need only show that there is a genuine issue of material fact on each of these elements. *Chiari v. City of League City*, 920 F.2d 311, 314–15 (5th Cir. 1991).[3]

---

1. As pointed out in Crocker's affidavit, his opinions "did not take into consideration whether the employer could have reasonably accommodated [Pegues] and whether [she] was a qualified individual with a disability."

2. Defendants do not address the state constitutional issue, which was pled in the complaint and preserved in the pretrial order.

3. In seeking guidance for its decision, this court, as have many others, turns to cases decided under the Rehabilitation Act. That Act and the ADA are very similar, and courts frequently borrow precedent and analysis from one in interpreting the other. *See, e.g., Chandler v. City of Dallas*, 2 F.3d 1385, 1391 (5th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994); *Stradley*, 869 F.Supp. at 443 n. 1.

A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In pertinent part, a "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices . . . and other similar accommodations. . . ." 42 U.S.C. § 12111(9)(B). However, it does not include anything that would pose an undue hardship, i.e., significant difficulty or expense, on the operation of the business, 42 U.S.C. §§ 12112(b)(5)(A) and 1211(10)(A), and does not require the business to fundamentally alter its program or to find or create a new job for the individual. *Daugherty v. City of El Paso,* 56 F.3d 695, 700 (5th Cir.1995).

▮ Defendants do not dispute that Pegues has proved the first element of her prima facie case, i.e., that she suffers from a qualifying disability. *But see McKay v. Toyota Motor Manufacturing, U.S.A., Inc.,* 878 F.Supp. 1012, 1016 (E.D.Ky.1995) (individuals with carpal tunnel syndrome are not necessarily disabled as matter of law under ADA). Instead, defendants focus on whether Pegues is a qualified individual under the ADA. In that regard, their argument is twofold. First, defendants maintain that, based on the representations and testimony of Pegues and her vocational expert before the Worker's Compensation Commission and the Social Security Administration that she is unable to work and that there is no job in the economy that she can do and the subsequent findings by both entities to that effect, Pegues is now estopped from arguing that she is qualified for any position at Emerson. Second, defendants argue that even if the issue of reasonable accommodation is relevant, Pegues has failed to meet her summary judgment burden on that question with regard to the type of reasonable accommodation the company could have made.

In response, Pegues argues that "a genuine issue of material fact arises as to whether . . . [she] could have performed the essential functions of her previous scoping position as well as jobs in [Emerson's] light duty work program, and the diecast assembly loader/unloader job, *had* Defendants provided her a reasonable accommodation." (Emphasis in original). The only reasonable accommodations she suggests are a job transfer or a leave of absence. She also discounts defendants' estoppel argument by characterizing it as an attempt to use other federal and state laws to preempt the ADA.

▮ To show that she is a qualified individual under the ADA and giving the case law the broadest interpretation possible, Pegues must raise a genuine issue of material fact (1) that she could perform the essential functions of her job, or if not, (2) that with reasonable accommodation, she could perform the essential functions of some position at Emerson. *Chandler,* 2 F.3d at 1393–94. There is no doubt that Pegues could not perform the essential functions of the last job she held at Emerson. This conclusion is obviously based on the fact that she performed the diecast duties for only two and one-half days before returning to her doctor with renewed complaints of hand and shoulder pain.

▮ The court therefore turns to the second part of this test. As noted previously, it is Pegues' burden to show the existence of a genuine issue of material fact on the question of whether she is a qualified individual under the ADA, which in turn necessarily requires her to show that reasonable accommodation of her disability was possible. *See Benson v. Northwest Airlines, Inc.,* 62 F.3d 1108, 1112 (8th Cir.1995) (employee must make prima facie showing that reasonable accommodation is possible); *Oswald v. Laroche Chemicals, Inc.,* 894 F.Supp. 988, 995 (E.D.La.1995) ("burden is on the plaintiff to show that accommodation was possible to perform the essential functions of the job").

Although the court does not believe that a finding of disability by the Workers' Compensation Commission or the Social Security Administration necessarily forecloses an ADA claim, it is the substance of Pegues' and Crocker's testimony and representations in those proceedings and the subsequent findings by both administrative bodies which

trouble this court and pose the greatest hurdle for Pegues. On the one hand, Pegues represented in the administrative proceedings that she cannot work, and those representations were accepted and disability benefits, *based on an inability to work,* were awarded. Yet on the other hand, she has come before this court and argued that if Emerson had reasonably accommodated her by transferring her to the scoping position or light-duty work, she could have performed the essential functions of those jobs. These positions are clearly inconsistent, and regardless of the label attached to this phenomenon, their advancement is not legally proper. Other courts considering identical or similar fact situations have almost universally agreed with this result. *See Smith v. Midland Brake, Inc.,* 911 F.Supp. 1351, 1358 (D.Kan. 1995) (even if finding of disability by Social Security Administration "took into consideration age and other factors, this does not change the fact that the plaintiff unqualifiedly stated that he was unable to work. The case law is clear that it is the plaintiff's inconsistent representations which have preclusive effect"); *Harden v. Delta Air Lines, Inc.,* 900 F.Supp. 493, 497 (S.D.Ga.1995) (court found it " 'incredible' that a[n] [ADA] plaintiff would claim that he was discriminated against by his employer for failing to make reasonable accommodations while representing to various entities that he was unable to work"; it concluded there was "no reasonable accommodation that can be given to allow a totally disabled person, as plaintiff claims he was, to perform the essential functions of any job"); *Cheatwood v. Roanoke Industries,* 891 F.Supp. 1528, 1538 (N.D.Ala. 1995) (plaintiff testified at workers' compensation trial that he could not even perform basic household tasks; court found plaintiff could not make out prima facie case under ADA as he was "bound by his prior testimony that he could not perform the essential functions of his prior job"); *Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547, 555 (D.Kan.1995) (ADA plaintiff consistently represented her inability to perform material job

duties in applying for and receiving long-term disability insurance and social security disability benefits; court found that "based on these unambiguous and seemingly informed representations, plaintiff is estopped from now claiming that she *could* perform the essential functions of her position") (emphasis in original); *Reigel v. Kaiser Foundation Health Plan of North Carolina,* 859 F.Supp. 963, 970 (E.D.N.C.1994) (court found ADA plaintiff had failed in her summary judgment burden on the "qualified individual" issue where plaintiff was collecting disability benefits based on her inability to work while arguing she could perform essential job functions; court concluded that she "cannot speak out of both sides of her mouth with equal vigor and credibility"). *But see Oswald,* 894 F.Supp. at 996 (distinguishing *Reigel* on basis of existence of genuine issue of material fact regarding doctor's assessment of plaintiff's abilities to perform essential functions of job in question). Although a job reassignment is a recognized form of reasonable accommodation, in light of her testimony and that of her experts, Pegues would not have been able to perform the essential functions of any job Emerson had offered her, and therefore, she was not a qualified individual under the ADA.[4]

■ As to her suggestion that Emerson could have placed her on an extended leave of absence as a form of accommodation, the court does not believe that suggestion is reasonable. Pegues had already been allowed nearly an entire year of leave to treat her injury and its residual problems. Although it is reasonable for an employer to allow an employee a temporary leave of absence to recuperate from a disabling injury, the court does not believe the ADA requires the employer to extend that leave indefinitely. Indeed, the purpose of a reasonable accommodation is not to place the disabled employee in a superior position but rather to enable her "to enjoy an equal opportunity for benefits and privileges of employment as are en-

---

4. By not coming forward with any argument that these jobs (or the diecast position itself, for that matter) could have been restructured or her schedule otherwise modified in such a way as to enable her to accomplish their essential functions, she fails to discharge her summary judgment duties in that regard.

joyed by employees without disabilities." *Howell v. Michelin Tire Corp.,* 860 F.Supp. 1488, 1492 (M.D.Ala.1994). *See also Tyndall v. National Education Centers,* 31 F.3d 209, 213 (4th Cir.1994) (employee who cannot meet attendance requirements of job cannot be considered qualified individual under ADA); *Wimbley v. Bolger,* 642 F.Supp. 481, 485 (W.D.Tenn.1986) (employee who does not come to work cannot perform any job functions, "essential or otherwise"), *aff'd,* 831 F.2d 298 (6th Cir.1987). Furthermore, even if the company had allowed her an additional extended sick leave, as permitted under the sick leave provisions of its employee handbook, it would not have aided her return to work, since, according to Pegues' recent representations, she remained unable to work, i.e., to perform the essential functions of any job, as late as 1995. As Pegues has failed to raise a genuine issue of material fact on the question of whether she is a qualified individual under the ADA and defendants are entitled to judgment as a matter of law on that issue, summary dismissal of that claim is appropriate.

■ Furthermore, as to the ADA claim against Mosley individually (which Pegues does not address in her response), the court is of the opinion that claim should be summarily dismissed for additional reason that Mosley was not an "employer" within the meaning of the ADA. *See Garcia v. Elf Atochem North America,* 28 F.3d 446, 451 n. 2 (5th Cir.1994) (construing identical Title VII definition of "employer").

## II.

### A. Negligent and Intentional Infliction of Emotional Distress

■ An action for the intentional infliction of emotional distress occurs "[w]here there is something about the defendant's conduct which evokes outrage or revulsion, done intentionally ... the results being reasonably foreseeable ... even though there has been no physical injury." *Sears, Roebuck & Co. v. Devers,* 405 So.2d 898, 902 (Miss.1981). "[T]he contours of this 'outrage or revulsion' standard are not clearly defined in the Mississippi case law," *White v. Walker,* 950 F.2d 972, 978 (5th Cir.1991); however, "[d]ecisions rendered by the Supreme Court of Mississippi and federal courts sitting in diversity jurisdiction in the Magnolia state on intentional infliction of emotional distress claims consistently turn on whether a plaintiff satisfies the requisite elements set forth in the Restatement (Second) of Torts." *Jenkins v. City of Grenada,* 813 F.Supp. 443, 446 (N.D.Miss. 1993). Comment *d* to Section 46 offers the best explanation of this tort:

> One who by extreme and outrageous conduct intentionally and recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.... [G]enerally, the case is one in which the recitation of the fact to an average member of the community would arouse as a resentment against the actor, and lead him to exclaim, 'outrageous.' The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities.

Restatement (Second) of Torts § 46 cmt. d. Furthermore,

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Id. See also Burroughs v. FFP Operating Partners, L.P.,* 28 F.3d 543, 546 (5th Cir. 1994). "[I]t is the nature of the act itself—as opposed to the seriousness of the consequences—which gives impetus to legal redress." *Devers,* 405 So.2d at 902.

■ A claim for intentional infliction of emotional distress will not ordinarily lie for mere employment disputes. *Jenkins,* 813 F.Supp. at 447. "Recognition of a cause of action for intentional infliction of emotional

distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time." *White v. Monsanto Co.,* 585 So.2d 1205, 1210 (La.1991). *See, e.g., Prunty v. Arkansas Freightways, Inc.,* 16 F.3d 649, 654–55 (5th Cir.1994) ("Only in the most unusual cases does the conduct move out of the 'realm of an ordinary employment dispute' into the classification of 'extreme and outrageous,' as required for the tort of intentional infliction of emotional distress").

■ In this case, Pegues' only argument against summary dismissal of this claim is that she had "testified in her deposition about the harm and distress Defendants' unlawful actions in terminating her caused her. There clearly is a factual question with regard to the nature and extent of Plaintiff's harm...." The court does not agree with this meager argument but rather finds that the actions of Emerson in terminating Pegues and those attributable to Mosley were neither extreme nor outrageous but rather "'fall within the realm of an ordinary employment dispute.'" *Johnson v. Merrell Dow Pharmaceuticals, Inc.,* 965 F.2d 31, 34 (5th Cir.1992) (citation omitted). No reasonable juror could find otherwise, and that claim is therefore dismissed with prejudice.

■ As to the claim of negligent infliction of emotional distress, the court is of the opinion that it is also not well taken. Again, Pegues offers no argument for its survival other than that quoted above. Although the tort is recognized in Mississippi, *see Devers,* 405 So.2d at 902, the court finds it at odds with the notion of at-will employment, a status that Pegues admittedly occupied. Furthermore, to recovery under this theory, Pegues was required to show that as a result of defendants' conduct she suffered either a "physical illness or assault upon the mind, personality or nervous system ... which is medically cognizable and which requires or necessitates treatment by the medical profession." *Id.* She has failed to discharge that burden, and therefore, the motion of Emerson and Mosley for summary judgment on the negligent infliction of emotional distress claim is granted, and that claim is dismissed with prejudice.

## B. Wrongful Discharge

■ In this claim, Pegues argues that there is a genuine issue of material fact "as to whether [Emerson] complied with its own policy handbook" in effecting her termination. She states generally that the handbook "contained specific procedures and mechanisms for terminating employees" and during Mosley's deposition, points to a handbook provision which states: "No employee will be discharged without a fair hearing and a thorough investigation by the Plant Manager. To insure this, a three-day suspension period will be observed to collect all the facts and review them before any final action is taken." In support of her position, Pegues directs the court's attention to *Bobbitt v. The Orchard, Ltd.,* 603 So.2d 356 (Miss.1992), which stands for the proposition that

> when an employer publishes and disseminates to its employees a manual setting forth the proceedings which will be followed in event of an employee's infraction of rules, and there is nothing in the employment contract to the contrary, then the employer will be required to follow its own manual in disciplining or discharging employees for infractions or misconduct specifically covered by the manual.

*Bobbitt,* 603 So.2d at 357. In response, defendants maintain that Pegues has failed to prove the contractual nature of this provision or that Emerson in any way violated the provision. Indeed, defendants point to a different handbook provision which states: "If it is necessary to be absent, notify your Supervisor as early as possible.... If you are absent for three consecutive days without notice, it will be assumed you have voluntarily quit and you will be terminated."

■ The court agrees that summary judgment on this claim is appropriate but approaches that conclusion from a slightly different avenue than defendants. Pegues admits that she had no written contract of employment with Emerson; she was therefore an at-will employee and could be terminated for any reason (except an illegal reason, of course). Even if the court accepts Pegues' position that the Emerson handbook

required a hearing before she could be terminated, Pegues does not benefit from that assumption. The court reaches that conclusion for several reasons. First, the handbook at issue here is clearly distinguishable from the one given to the employees in *Bobbitt*, who were contractual employees, though still terminable at will. The *Bobbitt* handbook was specific about punishable offenses and the increasing levels of punishment associated with each infraction. The effect of such a hierarchy of punishment was to limit the defendant's ability to terminate employees at will when they violated work rules. Here, the handbook is vague and generalized and says nothing more about punishable offenses than that already noted, and it does not otherwise impede Emerson's ability to terminate its employees, even those violating company policy, at any time and for any reason.

Second, although the Emerson handbook does provide for notice via a three-day suspension, it does not otherwise indicate the kind of hearing Emerson intended to afford employees who were being considered for discharge. Indeed, the only "hearing" envisioned by this handbook provision consists of a fact-gathering venture and review before final action. In that light then, the company afforded Pegues a hearing. Although Mosley's first letter to Pegues served initially as notification of Emerson's final decision, it effectively acted as a notice of impending action only, for when Pegues pointed out to Mosley the perceived error in the company's decision, i.e., that she had not voluntarily quit and that her doctor had indicated that he would notify Emerson of her absence, Emerson reconsidered its decision with those things in mind. That does not, however, change the fact that there is nothing in this handbook, unlike the *Bobbitt* handbook, which prevented Emerson from accepting Pegues' position as true and correct and then, as harsh as it sounds, from terminating her employment anyway, which is what it did.

As there is no genuine issue of material fact, and defendants are entitled to judgment as a matter of law on this claim, it is dismissed with prejudice.

### C. Violation of Mississippi Constitution

In the complaint, Pegues charges generally that Article 7, § 191 of the Mississippi Constitution was violated. It is never mentioned again in that document or in the summary judgment proceedings now under consideration. That allegation did, however, rear its head again in the pretrial order, which was recently entered, in the form of a contested issue of law: "Whether Art. 7 § 191 of the Mississippi Constitution is self-executing, thereby granting substantive rights and providing a private right of action for the vindication of those rights." That provision states: "The legislature shall provide for the protection of the employees of all corporations doing business in this state from interference with their social, civil, or political rights by said corporations, their agents or employees." Miss. Const. of 1890, art. 7, § 191 (1890). Under the plain language of this provision, the court doubts the validity of this claim, but as it is not properly before this court for summary dismissal, defendants having failed to move on that basis, the court cannot fully consider it until the parties have been permitted to argue their respective positions. A deadline for submitting legal argument on this point will be included in the accompanying order. Because only a legal question remains in this cause, trial will be cancelled until further order.

### CONCLUSION

After careful consideration, the court finds defendants' motion for summary judgment is granted as to the ADA, wrongful discharge, and negligent and intentional infliction of emotional distress claims, which are dismissed with prejudice. As only one legal issue remains, which the court believes may be appropriate for summary dismissal, trial is cancelled until further notice. The briefing deadlines on the state constitutional claim will be set out in the accompanying order.

*ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, CANCELLING TRIAL, AND SETTING BRIEFING DEADLINES ON REMAINING ISSUE*

Pursuant to an opinion filed contemporaneously herewith, it is ORDERED:

That defendants' motion for summary judgment is granted, and plaintiff's claims under the Americans with Disabilities Act and for wrongful discharge and negligent and intentional infliction of emotional distress are dismissed with prejudice;

That the trial presently scheduled to begin on February 14, 1996, is cancelled until further notice;

That, no later than February 12, 1996, the parties shall submit memoranda arguing their respective positions on why plaintiff's claim brought under the Mississippi Constitution should or should not be dismissed by summary judgment.

SO ORDERED.