821 So.2d 827 (2001)
Henry CLARK, Appellant,
v.
LUVEL DAIRY PRODUCTS, INC. and James H. Briscoe, Appellees.
No. 1999-CA-01697-COA.
Court of Appeals of Mississippi.
September 25, 2001.
Rehearing Denied February 5, 2002.
Certiorari Denied July 18, 2002.
*829 Tylvester Otis Goss, Jackson, Thandi Wade, Attorneys for Appellant.
John David Price, Jackson, Attorney for Appellees.
Before McMILLIN, C.J., BRIDGES, and MYERS, JJ.
MYERS, J., for the Court:
¶ 1. Henry Clark appeals the judgment of the Hinds County Circuit Court granting motions for directed verdict and judgment notwithstanding the verdict in favor of the defendants. Finding no error, we affirm.

FACTS
¶ 2. Clark was employed with Luvel Dairy Products for approximately twenty-four years. On January 9, 1996, he was told that James Briscoe, the president of the company, wanted to speak with him. When Clark arrived at Briscoe's office, he was told that the company had evidence that he had been stealing inventory and selling it for profit. A saleswoman at a store in Leake County was claiming that she had been sold stolen Luvel ice cream by a black man with a deformity in his eye. Briscoe informed Clark that he could either quit or be fired. Briscoe told Clark that he had lost faith in Clark and that he did not trust Clark anymore. Clark refused to resign, and Briscoe threatened to call the sheriff to investigate the alleged crime. Clark told him to call the sheriff.
¶ 3. When the sheriff's deputy arrived at Luvel, he and Briscoe took Clark's license, along with the licenses of three other employees, to the store where the stolen ice cream had allegedly been sold. Before they left, Briscoe told Clark that he was fired and to clock out and leave the Luvel *830 premises immediately. When the deputy and Briscoe arrived at the store where Clark had allegedly sold the stolen ice cream, the saleswoman who allegedly bought the ice cream was not there. The manager of the store took the licenses to the saleswoman for identification of the person who sold her the ice cream, but the saleswoman said that she could not positively identify the seller. After that, Briscoe informed the deputy that he would not pursue the matter any further.
¶ 4. Clark subsequently brought this action against Luvel Dairy Products, Inc. and James Briscoe for defamation, intentional infliction of emotional distress, actionable words and false imprisonment. At the close of the plaintiff's case, the trial court granted a directed verdict in favor of the defendants on the issues of actionable words, intentional infliction of emotional distress, and false imprisonment. The defamation issue was submitted to the jury, and the jury found in favor of the plaintiff, awarding him $126,000 in compensatory damages. The defendants then moved for a judgment notwithstanding the verdict, which the trial court granted. In granting such motion, the trial court noted that there was substantial evidence presented that Clark was actually stealing ice cream from Luvel and that there was no evidence presented that Briscoe ever acted with malice toward Clark during the events giving rise to this litigation.

DISCUSSION

I. THE TRIAL COURT ERRED IN GRANTING THE DEFENDANTS' MOTION FOR DIRECTED VERDICT ON THE PLAINTIFF'S CLAIMS FOR ACTIONABLE WORDS, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND FALSE IMPRISONMENT.

Actionable Words
¶ 5. In his original action, Clark alleged a claim against Luvel and Briscoe for actionable words. Mississippi's actionable words statute articulates that "[a]ll words which, from their usual construction and common acceptation, are considered as insults, and calculated to lead to a breach of the peace, shall be actionable." Miss. Code Ann. § 95-1-1 (Rev.2000).
¶ 6. The trial court held that the words spoken by Briscoe could not reasonably be seen as expected to bring about a breach of the peace. In making this finding, the trial court noted that Briscoe never called Clark a "thief" outright. Rather, he found that Briscoe had told Clark that either Clark was stealing ice cream or knew who was stealing it. No one ever testified that Briscoe actually used the word "thief." Furthermore, Clark admitted on cross-examination that nothing that Briscoe said to him on the day in question led Clark to want to fight Briscoe.
¶ 7. The Mississippi Supreme Court has stated that:
[t]he law guards jealously the right to the enjoyment of a good reputation, but public policy, good morals, the interests of society, and sound business demand that an employer, or his representative, be permitted to discuss freely with an employee, or his chosen representative, charges made against the employee affecting the latter's employment. On such occasions there is a qualified privilege, and statements made within the scope of the privilege, in good faith and without malice, are not actionable. The truth or falsity of the communication is not involved so long as there is no bad faith or malice.
Killebrew v. Jackson City Lines, 225 Miss. 84, 91-2, 82 So.2d 648, 650 (1955).
*831 ¶ 8. In this case, Briscoe was given information tending to show that Clark was involved in the theft of merchandise. Briscoe then, in good faith, called Clark into his office to discuss the allegations. These actions were necessary to deal with a serious problem within the company. There was no evidence that Briscoe acted with malice or bad faith. The trial court acted correctly in sustaining the motion for directed verdict on the actionable words claim.

Intentional Infliction of Emotional Distress
¶ 9. In order to prevail in a claim for intentional infliction of emotional distress, it is necessary to show that the conduct complained of was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Pegues v. Emerson Elec. Co., 913 F.Supp. 976, 982 (N.D.Miss.1996) (quoting Restatement (Second) of Torts § 46 cmt. d. (1965)). Furthermore, "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." Lawson v. Heidelberg Eastern, 872 F.Supp. 335, 338 (N.D.Miss.1995) (quoting Restatement (Second) of Torts § 46 cmt. d. (1965)). Damages for such claims are typically not recoverable in employment disputes. Pegues, 913 F.Supp. at 982. Rather, "[o]nly in the most unusual cases does the conduct move out of the `realm of an ordinary employment dispute' into the classification of `extreme and outrageous,' as required for the tort of intentional infliction of emotional distress." Prunty v. Arkansas Freightways, Inc., 16 F.3d 649, 654 (5th Cir.1994) (citing Dean v. Ford Motor Credit Co., 885 F.2d 300, 307 (5th Cir.1989); Wilson v. Monarch Paper Co., 939 F.2d 1138, 1145 (5th Cir.1991)).
¶ 10. The trial court found that because Clark was a terminable-at-will employee, and because there was no evidence that Briscoe acted in bad faith, the issue of intentional infliction of emotional distress was without merit. The trial court was not swayed by the fact that Briscoe told Clark to leave the Luvel premises and to never come back. As stated above, we see no evidence of bad faith on the part of Briscoe. We find, as the trial court did, that Briscoe's actions did not rise to the level of an attempt to inflict emotional distress. Nor was Briscoe's conduct extreme and outrageous. The record indicates that he did what was necessary to resolve a very serious problem. For these reasons, we find that sustaining the motion for directed verdict on this issue was appropriate.

False Imprisonment
¶ 11. To succeed in a claim for false imprisonment, "a plaintiff must prove (1) he or she was detained and (2) that the detention was unlawful." Page v. Wiggins, 595 So.2d 1291, 1294 (Miss.1992) (citing Thornhill v. Wilson, 504 So.2d 1205, 1208 (Miss.1987)).
¶ 12. In directing a verdict in favor of the defendants on the issue of false imprisonment, the trial court found that there was no evidence presented indicating that Clark was ever subjected to forced detention or actual detention. We agree. As noted by the trial court, Clark himself admitted that he stayed at the plant through the completion of the investigation voluntarily. The record contains no evidence that Clark was ever forcibly detained or made to feel that he could not leave if he so desired. Because there is no proof of detention, the claim for false imprisonment fails. Directed verdict on the *832 claim for false imprisonment was therefore appropriate.

II. THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AS THE FINING OF THE JURY WAS REASONABLE AND SHOULD NOT HAVE BEEN DISTURBED.
¶ 13. When presented with a motion for JNOV, it is incumbent upon the trial court to consider all evidence in the light most favorable to the non-moving party, together with all favorable inferences that may reasonably be drawn therefrom. Hammack v. Czaja, 769 So.2d 847, 851 (¶ 9) (Miss.Ct.App.2000).
¶ 14. As noted above, the trial court stated that it granted the JNOV because there was overwhelming evidence presented which tended to establish that Clark was actually stealing ice cream from Luvel. Once again we find ourselves in accord with the trial court. William Jones, Dominick Roby and Kevin Brunt, former Luvel employees, and Paul Bingham, a current Luvel employee, all testified that they had participated in the theft of Luvel ice cream with Clark. Jimmy Cross and Kelsey Harmon, both former Luvel employees, testified that they personally observed Clark stealing merchandise.
¶ 15. The testimony of these six individuals constituted overwhelming evidence that Clark was, in fact, stealing dairy products from his employer. We reiterate the precedent that "[t]ruth is an absolute defense to a defamation lawsuit in Mississippi." Journal Pub. Co. v. McCullough, 743 So.2d 352, 360 (¶ 26) (Miss. 1999).
¶ 16. We also note that one of the essential requirements of a defamation action is unprivileged publication to a third party. Id. at 359 (¶ 22). The only persons to whom Briscoe communicated his belief that Clark was stealing were Clark himself, the deputy sheriff, and essential management personnel. We find that these communications were protected by a qualified privilege. Killebrew, 225 Miss. at 91-2, 82 So.2d at 650. As such, Briscoe can only be found liable for defamation if there is evidence that he acted or spoke in bad faith or with malice. There was no evidence presented to indicate such.
¶ 17. For these reasons, the trial court's rendering of a JNOV on the defamation claim was warranted, and we decline to reverse.
¶ 18. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS HEREBY AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., SOUTHWICK, P.J., BRIDGES, THOMAS, LEE, AND CHANDLER, JJ. CONCUR. IRVING, J., DISSENTS WITH WRITTEN OPINION JOINED BY KING, P.J. BRANTLEY, J., NOT PARTICIPATING.
IRVING, J., dissenting:
¶ 19. Henry Clark, a black employee of Luvel Diary Products, Inc. who had been employed with Luvel for twenty-four years with an impeccable work record, was abruptly fired on January 9, 1996, after being accused by James H. Briscoe, president of Luvel, of stealing ice cream from Luvel. At the time Mr. Clark was fired, he had no written reprimands in his file. In the aftermath of the firing, Mr. Clark sued Luvel and Briscoe for actionable words, intentional infliction of emotional distress, false imprisonment and defamation of character. The trial judge did not allow the jury to consider the claims for actionable words, intentional infliction of *833 emotional distress and false imprisonment. However, he submitted the defamation of character issue to the jury.
¶ 20. The jury awarded Clark $126,000 on the defamation of character claim. The trial court took away the jury verdict pursuant to Luvel and Briscoe's "Motion for Judgment Notwithstanding the Verdict or in the First Alternative, a Motion for a New Trial and in the Second Alternative a Motion for a Remittitur."
¶ 21. The majority has approved the trial judge's substitution of his judgment for that of the jury. Because I cannot find, on the facts of this case, any rational or legal basis for this usurpation of the jury's role, I respectfully dissent.
¶ 22. The majority justifies its agreement with the trial judgethat it was proper to take away the jury verdicton the ground that the testimony of six witnesses, William Jones, Dominick Roby, Kevin Brunt, Paul Bingham, Jimmy Cross and Kelsey Harmon "constituted overwhelming evidence that Clark was, in fact, stealing diary products from his employer" and that "`[t]ruth is an absolute defense to a defamation lawsuit in Mississippi.'" Majority Opinion at ¶¶ 13 and 14.
¶ 23. I agree with the majority that "truth is an absolute defense to a defamation lawsuit in Mississippi," but I disagree with the majority that, in Mississippi, it is permissible for the court to substitute its judgment in the place and stead of the jury in determining what the truth is. Based on the majority's categorical statement, one would think the evidence was not in conflict or that the jury had no basis or authority to disbelieve part or all of what these witnesses testified to. Since the grant of a motion for a JNOV says there was no legally sufficient evidence to support what the jury did, it is necessary that I support this dissent with extensive excerpts of the facts as testified to by the various witnesses who supposedly possessed knowledge that Mr. Clark was stealing diary products from Luvel.
¶ 24. I will discuss pertinent portions of the testimony of the six witnesses mentioned by the majority plus pertinent portions of the testimony of Mr. Clark, Mr. Briscoe, Kenneth Summers, investigator for the Attala County Sheriff's Office, Leslie Bass,[1] the general manager of Luvel, Jeffrey Pertee, a former Luvel employee, Freddie Tanksley, the route supervisor for Luvel.
¶ 25. Mr. Briscoe was called as an adverse witness and testified that he fired Mr. Clark on January 9, 1996. He testified that "[i]t's my honest belief that Henry Clark was misappropriating inventory. But did I catch him, no." He also admitted that, on the day he fired Mr. Clark, he probably told Mr. Clark that he had been watching him for eight months and might have been watching him longer than that. Mr. Briscoe further testified that Paul Bingham confessed to stealing diary products but that he did not fire Bingham. His testimony on this point regarding Bingham was, "I had no idea that Mr. Bingham was involved in this. It was a long time afterwards, and he came to me and he said, Jimmy, I made a mistake. I did this." Also, during Mr. Briscoe's testimony, the following exchange occurred:
Q. Okay. Just so the jury is clear, Mr. Briscoe, at the time that Henry Clark was terminated by you, would you tell the jury what evidence you had that suggested that he was involved *834 in the theft of diary products.
A. I don't think that I will because I don't think that I blamed him for that as the reason for the dismissal. I think that there are other people that are going to come and they're going to tell you whether he did or didn't to do it. It had nothing to do with me firing him that day.
It's my belief that he was a party to transactions that were going on that weren't right, or he had to have seen them. But let the other people who have firsthand information tell you. I don't know anything. I didn't have any firsthand information.
Q. So it's your testimony on the date you terminated Henry Clark, January 9th, 1996, you didn't have any firsthand information that he was stealing.
A. Yes. That's true.
Mr. Briscoe gave other testimony designed to convince the jury that he never called Mr. Clark a thief and that the real reason he fired Mr. Clark was that he simply lost confidence in Mr. Clark.
¶ 26. Kenneth Summers testified that Mr. Briscoe called him and told him that Luvel was missing some of their products, that some of it had turned up in Leake County, and that Briscoe had talked to a lady in Leake County who said that one of her cashiers was buying milk from a black male that worked at Luvel. This individual, according to what the lady allegedly told Briscoe, had an abnormality with his eye. Summers said that Briscoe told him that Briscoe had an employee that fit that description. Summers went to the Luvel plant and directed Briscoe to call the employee in [presumably in the office or room where Briscoe and Summers were] so he could talk with him. The employee that Briscoe called in was Henry Clark.
¶ 27. Summers also testified that "[w]e told Mr. Clark why I was there. I told him why I was there." Summers testified that Clark wanted to know "why we had him," and I "told him about the situation with the eye." Summers further testified that Clark told him that Clark "didn't have anything to do with it, and he didn't know anything about it." During the conversation with Clark, according to Summers, Clark advised that there were other people that worked at Luvel that had a deformity with their eye. Summers got the names of those individuals and two other employees were called in. They denied any involvement in the disappearance of Luvel products. Summers then took Clark's driver's license, along with the license of the two other persons, to Carthage "to try to let the girl that had bought the milk identify them by their driver's license."
¶ 28. Summers further testified that:
When we [he and Mr. Briscoe] got down to the store we sat around for probably an hour or so. It was a lengthy amount of time. The lady that was supposed to have bought the milk didn't show up. We talked with the lady that initially talked to Mr. Briscoe about this.
She came up and told us to meet her down the road at a tax place ... We drove down there, myself and Mr. Briscoe. The lady didn't want any of us coming to the house....
She took the license, went back, and it probably wasn't ten minutes later ... that she come [sic] back and said that she couldn't positively identify anybody that was in the photograph.
Mr. Briscoe on the way back to Kosciusko said that, you know, that's it. He's had enough of it. And that was it. That was the end of the investigation.
*835 Investigator Summers said he did not talk or take a statement from Kelsey Harmon and did not talk to Dominick Roby, Paul Bingham, or Kevin Brunt. Investigator Summers was asked if Mr. Briscoe gave him the names of any witnesses who were saying that Mr. Clark was stealing diary products, and he evaded answering the question.
¶ 29. Sam Bass testified that he was general manager of Luvel Diary Products and that he had been employed there for seventeen years. He testified that he had worked with Mr. Clark from the time Clark came to Luvel until the time Clark left and that Clark "was a good employee, very cooperative, did a good job." He testified that he never gave Mr. Clark any written reprimands. Mr. Bass further testified that on the morning Mr. Clark was fired, Mr. Briscoe called Bass on Briscoe's car telephone and told Bass that he was on his way to Kosciusko and would like to have a meeting with Bass and Clark as soon as he got there. When Briscoe arrived, he told Bass the purpose of the meeting and instructed Bass to summon Clark to the office. Bass was asked what reason did Briscoe give for wanting to meet with Bass and Clark, and Bass answered: "The reason he gave was that he had information that a person had been selling ice cream in the Carthage area, and the personthe description fit Henry [Clark]." Mr. Bass was asked if Paul Bingham, Kevin Brunt, Jim Cross, William Jones, Dominick Roby, or Kelsey Harmon presented any evidence against Clark during the meeting when Clark was fired. His answer was "no."
¶ 30. Mr. Bass also testified that he had no evidence that Mr. Clark was involved in the theft of merchandise from Luvel, and testified further:
Q. I want to ask you about this, Mr. Bass. A year before this incident happened, did Mr. Clark submit his resignation to you?
A. He did at some point. I'm not sure how long.
Q. Would you tell the jury why he submitted his resignation to you?
A. He submitted his resignation saying that the people that were working with him were not working for him and with him, and he was discouraged and didn't want to put up with it anymore.
Q. Okay. And what was your response to this?
A. My response was to tell him to forget that and I wanted him to stay.
Q. And did you want him to stay because you had lost confidence in him or because you thought he had the ability to do the job?
A. Because he had the ability to do the job, and I needed someone to do it.
¶ 31. Jeffrey Pertee testified that he came to work for Luvel in 1989 and worked there until 1999. He left because he found a better job at Patterson Lumber in Kosciusko. He testified that he learned from his supervisor, the day after Mr. Clark was fired, that Mr. Clark was fired for stealing ice cream. He was shocked to learn that Mr. Clark had been fired. Pertee testified that he had never talked to anyone who told him that Mr. Clark stole ice cream.
¶ 32. Dominick Roby testified that he cleaned up at Luvel and that he heard at the plant that Mr. Clark had been fired because "some lady had called about some ice cream, or something was bad." He was asked if he knew whether the termination caused Mr. Clark any embarrassment in the community, and he answered, "Yeah, I guess to a certain extent." He was then asked to explain why he said that, and he responded, "Okay. Anybody *836 getting fired, if they was getting fired from stealing, that's embarrassing enough."
¶ 33. Roby also testified that he had firsthand knowledge that Mr. Clark was stealing ice cream. He explained that he worked from 4:00 in the evening to 6:00 in the morning and that he was at work when Mr. Clark would come in. Mr. Roby was asked what would Mr. Clark do when Clark reported for work, and the following exchange occurred:
A. He would come and get me and he would want me to watch while he would get the ice cream in case somebody came.
Q. Okay. And what would he do with the ice cream?
A. He would put it in the back of his vehicle or whatever he was driving.
Q. And what kind of vehicle was he driving?
A. Whatever he came in. Sometimes he came in his truck; sometimes he came in his car.
Q. Okay. So he would put ice cream in his car, ice cream in his truck, and he would leave?
A. Yeah.
Q. Okay. Did you ever report this to anybody?
A. No.
Q. Did Jimmy ever ask you if you had any information about Mr. Clark stealing dairy products?
A. After he
Q. Before
A. No.
Q. Okay. Did he ask you after if you had any information about Mr. Clark?
A. Yeah, after.
Q. What did you tell him the first time? What did you tell him the first time?

A. The first time?
Q. Yes.
A. I told him I knew.

Q. Oh, okay. Did you ever tell him that you didn't know, you didn't have any information?

A. Once upon a time I think I probably did.

Q. Okay. So it's your testimony that you told Mr. Briscoe something that was not true?

A. No. It's my testimony that I told Mr. Briscoe that I didn't know because I didn't want to get involved at once upon a time.
Q. Okay. So when you told him that you didn't know, that was not true?

A. Yeah. That was not true when I told him I didn't know. Yeah.

Q. Okay. And after Henry was terminated you told him that you did know; is that correct?

A. Yeah.

Q. Okay. And so the first time you told him you didn't know; the second time you told him you did know. Is that correct?

A. Yeah.

Q. Just so I'm clear.
A. Yeah.
Q. So is it safe to assume that you lied one time but you told the truth the other time?

* * * * * *
Q. And you're here today and you want this jury to believe you, even though you lied before about this incident. You want them to believe that you're telling the truth today; is that correct?

A. All I've got to say is I don't lie.

*837 Q. You don't lie. But now, you admitted earlier that you lied before; is that correct?

A. Yeah.

(emphasis added).
¶ 34. Kelsey Harmon testified that he filed complaints with management against Mr. Clark, and Mr. Clark filed complaints against him. Harmon complained, among other things, about Mr. Clark starting the machines on line before Harmon got to work, and Mr. Clark complained about Harmon and others not doing their jobs properly. Harmon also gave pertinent testimony via the following exchange:
Q. Let me ask you this, Mr. Harmon. Do you have any firsthand knowledge of Henry Clark selling ice cream?
A. Well, yeah.
Q. Okay. Tell the jury what firsthand knowledge you have. Has he sold you any ice cream?
A. No.
Q. Okay. What firsthand knowledge do you have?
A. Well, then when I first started there I was coming in early, about 2:30, 3:00 in the morning.
Q. And do what? Sell ice cream?
A. No, to work.
Q. Okay. My question was do you have any firsthand knowledge of Mr. Clark selling ice cream?
A. Oh, at the time, you know, it was just rumors then, you know, that he was. I never did say nothing.
Q. Oh, okay.
A. And I came in and I saw him put some on the truck.
Q. Tell the jury what kind of truck he put the ice cream on.
A. It was a work truck, the shop truck.
Q. Like a Luvel truck?
A. Yeah, one they use in the shop.
Q. Okay. Did you see him drive that truck off?
A. No. I went on in the building.
Q. Was it his job ever to load ice cream on the truck?
A. Not that I know of.
Q. Okay. Not that you know of. Oh, okay. Prior to Mr. Clark being terminated had you ever shared that information with anybody?
A. Well, no. The ladyone lady called me the same day he gotwell, he left there, and asked me about it. And I told them I don't know if he was fired or not, just like that.
Q. Okay. Let me ask a better question. Prior to January 9, 1996 had you ever told anybody in management that you saw Mr. Clark loading ice cream on the Luvel truck?
A. Have I ever told anybody?
Q. Yes.
A. Well, yeah, I have talked tosince I left?
Q. No. Before he was terminated did you tell anybody?

A. Oh, me and Jeff, we talked about it, but nobody else.

Q. You and who talked about it?
A. Me and Jeff.
Q. Who is Jeff?

A. Pertee.

Q. Mr. Pertee wasn't in management, was he?
A. Huh?
Q. Mr. Pertee was not in management?

A. No. He worked in the freezer with me.

Q. And when Jimmy Briscoe would come through and ask questions, if anybody had any knowledge about *838 anybody stealing dairy products, what would your response be?

A. I told him no.

Q. Okay. And that was before he was terminated. Let me ask you this question. On January 9th, 1996 did they ask you for your driver's license?

A. Yeah.

Q. And what was your response?
A. They could have it.
Q. Okay. Was the deputy sheriff there?

A. Yeah.
Q. Did you tell the deputy sheriff that you had information about Henry Clark at that time?

A. No.

Q. Oh, okay. When they asked you if you had any information, what did you tell them?

A. I told him no.

Q. And did you ever change your testimony?

A. Yeah, I did.

Q. When did you change?

A. Well, the nextabout two days after because when I got home he had called my wife and told my wife that I had told Jim Briscoe and them that he was selling ice cream.

Q. Oh, okay.
A. Which I didn't.
Q. Oh, okay. And then that's when you went back and told them that he was?

A. Yeah. He made me mad.

Q. He mad you mad?
A. Yeah, when he told that.
Q. And in fact, he made you so mad, when you saw him at the basketball game you threatened to kill him didn't you?
A. No.
Q. Tell me what you threatened to do to him.
A. I asked him why did he tell that lie.
Q. Did you tell him if he ever called your wife again you would hurt him?
A. Yeah.
* * * * * *
Q. Okay. And you remember me giving you you [sic] remember giving a deposition in this case, don't you?
A. Some of it.
Q. Do you remember me asking you if you knew whether or not Mr. Clark had a ticket to put the ice cream in the Luvel truck that he was putting it in? Do you remember what your response was?

A. No. I doubt he had a ticket, though.
Q. Oh, you doubt if he had a ticket. But did you know?
A. No, I didn't.
Q. Did you know if the ice cream was for a fund-raiser?

A. No. If it was, why would he get it at that time of night.
Q. Okay. What time of night was it? What time are we talking about?
A. About 2:30, 3:00 in the morning.
Q. Oh, okay. And he [sic] said he would load it on a Luvel truck. Did you see Mr. Clark ever drive a Luvel truck off the lot?

A. No. Like I told you, I went in the building.

Q. You went in the building?
A. Yeah.
Q. Okay. So you don't know what happened to the ice cream on the truck?

A. No, I don't.

Q. So any testimony on your part that Mr. Clark took the ice cream off the *839 lot would be speculation, is that correct, because you don't know?

A. Well, I didn't see him leaving, because like I said, I went on in the building.

(emphasis added).
¶ 35. Mr. Freddie Tanksley, the route supervisor who had been with Luvel for thirty-eight years, testified that his job entailed "seeing after any routes or any problems that comes up on a route, seeing after any new business on the routes." After some attempts at trying to evade the questions being asked by Clark's counsel, the following exchange took place:
Q. Okay. Do you have any firsthand information of Henry Clark stealing dairy products?

A. No, sir.

Q. And you've been employed at Luvel for 38 years?

A. Yes, sir.

Q. And so you were employed there the entire time Henry Clark was employed; is that correct?
A. Yes, sir.
Q. During that entire time did you hear rumors about Henry Clark stealing dairy products?

A. Yes, sir.

Q. Okay. Did you ever report those to management?

A. No, sir.

Q. Would you tell the jury why not?

A. I just never was asked about him.

Q. Okay. So it's your testimony that Jimmy Briscoe never came through the plant and said, does anybody have any information about missing dairy products?

A. No, sir, not to me.

(emphasis added).
¶ 36. Jim Cross testified that he worked for Luvel for approximately nine years. He said he last worked for Luvel in 1994 or 1995. In 1997, Mr. Briscoe requested that Cross come see him. When Cross went to see him, Briscoe asked him if he had any knowledge about Henry Clark stealing dairy products. At the time this conversation occurred, Cross was no longer a Luvel employee. Cross testified that he told Briscoe that Cross did have some knowledge of Clark stealing diary products. Thereafter, Cross testified as follows:
Q. Okay. And just so the jury is clear, before that time he [Briscoe] had asked you and you told him that you didn't have any knowledge; is that correct?

A. That's right.

Q. So before you had lied about the knowledge you had?

A. That's right.

(emphasis added).
¶ 37. Kevin Brunt, a route salesman, testified that he was terminated from Luvel in May of 1995 because of a shortage in money and inventory. He further testified that Mr. Clark provided him with ice cream that Brunt was not authorized to sell. He described how that process worked and said the money derived from selling the extra ice cream would be split fifty-fifty with Mr. Clark. He testified that this occurred essentially in 1982 and 1983. He also testified that there were several occasions when Mr. Clark got ice cream for himself. However, he testified further that he never saw Mr. Clark sell any ice cream. During cross-examination, Brunt admitted that when he was fired, he owed Mr. Briscoe $3,000. He was pressed by Clark's counsel as to whether he was trying to pay Mr. Briscoe back with his testimony. This is that exchange:

*840 Q. Okay. When you left Luvel, you owed Mr. Briscoe money, didn't you?
A. That's probably correct.
Q. So you are paying him back today, aren't you?
A. I'm clearing my conscience.
Q. You're clearing your conscience. Between '83, 1983you said this occurred from '83 to '95?
A. Correct.
Q. During this 12 year period you never felt the need to clear your conscience?
A. I did but was scared to.
He admitted that his father was still employed at Luvel and had been employed for approximately forty years. Further pertinent testimony was revealed in this exchange:
Q. Okay. Let me ask you about this. When you left Luvel in 1995, Jimmy [Briscoe] asked you how you were getting the ice cream, didn't he?

A. Uh-huh.

Q. What did you tell him?

A. Just writing it off the inventory.

Q. Okay. And he asked you who the other people were that were involved. What did you tell him?

A. I can't remember if he did or not?
Q. Yes, sir.
Q. If he did ask you, you didn't tell him that Henry Clark was involved, did you?

A. Probably not, not at that time. I wouldn't have.

Q. Just so the jury is clear, prior to January 9, 1996, had you shared any of this information with Jimmy Briscoe?
A. Prior to January of 1996, I don't think I did.
(emphasis added).
¶ 38. Paul Bingham testified that he was a route salesman at Luvel and that he had been employed there in that position for twenty-three years. Bingham was the only witness that was still employed at Luvel to testify that he had stolen ice cream in the past from Luvel. He claims that he and Clark had been engaged in a criminal enterprise whereby Clark would assist in loading ice cream on Bingham's delivery truck and Bingham would sell it and split the profit with Clark. He testified that he stopped stealing ice cream from Luvel when Mr. Briscoe offered to let bygones be bygones and call everything even if the employees, who were stealing, agreed to stop.
¶ 39. Bingham further testified that sometime before January 9, 1996, he "found some ice cream on my route that shouldn't be therewas not on my route but was in my territory." After the discovery, he told Mr. Briscoe about it. He said Mr. Briscoe went and talked with the store owner. He then gave this testimony:
Q. Do you know how it came about that you came and told about the situation that you were in, the situation that you had with Mr. Clark? Could you tell us how that came about, how Mr. Briscoe became aware of that.
A. The depositions were coming up, and I kept waiting on Mr. Briscoe to ask me. He'd asked everybody else to give one but he hadn't asked me. And I just kept waiting. And just before the time for the depositions, he was on the loading dock talking to me one day, and I asked him if he wanted me to give one. And he told me if I knowed [sic] something he'd appreciate it.

*841 Q. And you knew something.
A. Yes, sir.
¶ 40. On cross-examination, the following colloquy occurred:
Q. Mr. Bingham, you're still employed aren't you?
A. Yes, sir.
Q. And you're a confessed thief, aren't you?
A. Yes, sir.
Q. Okay. What's the difference between you and Mr. Clark?
A. The fact is I may not be employed any longer, but that's a chance I'm willing to take to tell the truth.
Q. That's a chance you're willing to take to tell the truth. Just so the jury is clear, and he asked you this question, prior to January 9th, 1996 had you related this conversation about Henry being involved with stolen products to Jimmy Briscoe?
A. No, sir.
Q. Okay. When Jimmy Briscoe asked the company do anybody have any knowledge how these products are missing, did you come forward?
A. No, sir.
Q. Tell the jury why you didn't come forward.
A. Because I was involved.
Q. Because you were involved. Okay. And tell the jury why you're coming forward now.
A. Because I think it's the right thing to do.
Q. Okay. And when you were involved, tell the jury the time frame that you were involved.
A. Somewhere around '85 to '87 or '88. I'm not sure exact times.
* * * * * *
Q. Earlier you said you may not be employed any longer. Is the testimony you're providing today contingent on your employment [sic]?
A. No, sir.
Q. Why did you make that statement?
A. Well, Mr. Briscoe after finding all of the facts of my involvement may decide that I no longer have a job.
Q. Okay. And he found out these facts inI think I took your deposition in June of '97, and you have been employed for Luvel since June of '97?
A. Yes, sir.
Q. And that's over a year and a half. Okay. You went to talk to the people in the stores where you found ice cream; is that correct?
A. Yes, sir.
Q. Did any of those people ever identify Henry Clark as the person who sold them the ice cream?
A. No, sir.
Q. Did Jimmy [Briscoe] at any time ask you to ask the people at those stores if Henry Clark sold them any ice cream.
A. No, sir.
¶ 41. As stated, William Jones was deceased at the time of trial, and his testimony was given by deposition. He testified that he worked for Luvel as a route salesman for nineteen years. He last worked for Luvel in December 1995. He further testified on direct examination that he and Clark were engaged in a scheme whereby Clark "would pull the ice cream and check it and put it on my truck, and I would take it out and sell it off a ticket and split the money with him. That's what we did, 50/50." On cross-examination, he gave the following interesting testimony about who else put ice cream on the trucks:

*842 Q. Let me ask you this: Was Mr. Clark the only person that put ice cream on your truck?
A. As far as I know.
Q. Every morning Mr. Clark was the person who loaded your truck?

A. Well, maybe somebody else, you know, helped push it on there. He didn't push it on every day.

Q. Who were some of the other people who pushed it on there?

A. Paul Bingham, he was one of them.

Q. Okay.
A. He helped me load. Just whoever was out there standing on the dock, Kevin Brunt or James Ellis. He was working there at that time.

* * * * * *
Q. Let me make sure I understand. You came forward with this information a month ago after the lawsuit was filed; is that correct?
A It was about a month. I had to go see Jimmy about my insurance, and he had asked me about it, and I told him.
* * * * * *
Q. Jimmy Briscoe asked you during this meeting about Henry Clark?
A. Well, we stepped outside, and he asked me did I know anything about it, and that's when I told him what I knew.
(emphasis added).
¶ 42. Mr. Clark, the Appellant, testified that he was lead freezer operator at Luvel when he was fired. He testified that he tried to resign in 1995, just a year before he was accused of stealing, because the employees on the line were uncooperative. Included among these employees was Kelsey Harmon. Clark further testified that Mr. Bass and Mr. Briscoe begged him not to quit and told him to reconsider his position and let them know something by the upcoming Friday. After reconsidering his decision to quit, Clark testified that he went to Mr. Bass and said if he and Mr. Briscoe really wanted him to stay he would. Beginning that Friday, according to Clark, he started "wearing khaki shirtsKhaki pants and white shirts in order that I would feel a part of Luvel." "I wore it starting then because that's what Mr. Bass wore. He wore white shirt and khaki pants. I wanted to be like Mr. Bass. I wanted to be Luvel."
¶ 43. He described what happened the day he was fired this way:
Mr. Jimmy Briscoe, he told me, he said, Henry, he said, you've got two choices. You can quit or I'm going to fire you. And I said, Mr. Briscoe, what is this all about. He said, Henry, you can quit or I'm going to fire you.
* * * * * *
I said, Mr. Briscoe, what is this all about. He told me, he said, Henry, he said, you're going to quit or I'm going to fire you. I said, Mr. Briscoe, I'm not going to quit. I said, if I have to leave this plant, you're going to have to fire me. I said, because if I quit I won't draw unemployment. He said, you won't draw that no way.
I said, Mr. Briscoe, I'm not going to quit. He said, well, Henry, I've got a lady in Leake County who said she could identify you for selling her ice cream. He said, I'm going to call the deputy sheriff and we're going to take you down there. If that lady identifies you, then, I'm going to prosecute you. I said, Mr. Briscoe, you call the deputy sheriff. He proceeded out of the room and Mr. Bass and I was in there together. And I looked across the table at Mr. Bass. I said, Mr. Bass, I said, why, why didn't you let me leave when I wanted to leave. He said, Henry, if I had known it would *843 have come down to this, I would have. Mr. Jimmy Briscoe came back into the room and said he had called the sheriff.
¶ 44. Clark testified further, regarding the meeting with Briscoe, that he offered to be taken in person, along with other persons from the plant, to see the woman, who Briscoe thought had accused Clark of stealing, to see if she would identify him, but Briscoe refused the offer because he did not want to shut the line down. Clark testified that he never participated in any of the schemes that William Jones, Paul Bingham and Kevin Brunt testified about. He point blank disputed the testimony of each of these witnesses and gave a logical explanation why they would want to frame him. Further, Clark explained as the lead freezer operator, he would be inside, not outside, the plant preparing to run for the day. As to his accusers' testimony about his having a route, Clark explained that he was not a route salesman. He worked inside the plant. He did not have access to a refrigerated truck to deliver ice cream, and stores were not opened in the morning when he would report to work. Clark testified that there were cameras at the front of the plant, and if he was stealing ice cream in the early morning hours and leaving the plant, the cameras would catch it.
¶ 45. During examination by his counsel, Clark was asked: "Mr. Clark, as you sit here today, tell the jury whether or not you have ever stolen any products from Luvel Diary Products?" His answer was: "I never have, never, never. I didn't raise my children to steal. I lead by example. What I do, I want my children to do. So I never stole anything from Jimmy Briscoe or Luvel Diary Products."
¶ 46. This evidence, in my view, unquestioningly presented a factual question both as to whether Briscoe acted with malice toward Clark when he accused him of stealing and as to whether Clark actually stole from Luvel. It is well settled in this jurisprudence that the jurynot the trial judge, not the appellate courtis the judge and final arbiter of the credibility of the witnesses. Wetz v. State, 503 So.2d 803, 812 (Miss.1987). Likewise, it is well settled in Mississippi jurisprudence that the standard for granting a motion for judgment notwithstanding the verdict is extremely high, and the standard for the appellate court in reviewing a trial court's grant of the motion is the same. That standard has been stated as follows:
[T]he trial court must consider all of the evidencenot just evidence which supports the non-movant's casein the light most favorable to the party opposed to the motion. The non-movant must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men could not have arrived at a contrary verdict, granting the motion is required. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motion should he denied and the jury's verdict allowed to stand.
Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss.1984).
¶ 47. The jury was faced with weighing the credibility of individuals who were confessed liars and thieves against the credibility of (1) a man who had an impeccable work record, (2) a man who was held in high esteem by the manager of the plant, (3) a man who tried to resign just one year earlier because he was tired of trying to produce for Luvel with individuals who *844 had shown no pride in their work and possessed no integrity and character, (4) a man who was asked just one year earlier by both the president of the company and the manager of the plant to please stay because he was so valuable to them, (5) a man who had demonstrated his value and commitment to the company time and time again by responding positively to the company's call no matter what it was. The jury resolved the matter in favor of that man. That was the jury's right, and its verdict should be upheld.
¶ 48. On this record, reasonable, impartial and fairminded men, and women, certainly could have reached different conclusions, but, in my judgment, it cannot be reasonably concluded, as does the majority, that the only verdict the jury could have reached was a verdict for Luvel and Briscoe. The majority seems to believe that the party with the greatest number of witnesses wins even if those witnesses are confessed liars and thieves. The majority also seems to believe that because Briscoe denied using the specific word "thief" that proved he did not use it. Further, the majority seems to overlook the fact that Clark testified that Briscoe told him that Briscoe had a lady who could identify Clark as having sold her some Luvel products. Could not the jury believe Clark, and if it did, did that not mean that Briscoe was accusing Clark of stealing the products the lady said she bought? For the reasons presented, I dissent.
KING, P.J., JOINS THIS SEPARATE OPINION.
NOTES
[1] This witness's name is given in the record as "Sam Bass," but when asked to give his name, he answered, "Leslie Bass." There is no explanation regarding the discrepancy. I will refer to him as "Sam Bass" since that is the name by which he is called in the record.