Ava Tyanne **JENKINS**, plaintiff,

v.

**CITY OF GRENADA, MISSISSIPPI and Ron Morgan, defendants.**

**Civ. A. No. WC 91–168–D–G.**

United States District Court, N.D. Mississippi, W.D.

Jan. 25, 1993.

---

David G. Hill, Oxford, MS, for plaintiff.

David E. Friedman and Susan D. Fahey, Jackson, MS, for defendants.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

Sexual harassment is the subject of this Title VII suit, premised on the landmark 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* Specifically, plaintiff alleges sex discrimination manifested in quid pro quo sexual harassment and a sexually hostile work environment. The complaint, filed on December 27, 1991, also states a claim for retaliation. Retaliatory measures, plaintiff asserts, were taken against her for complaining to the city of Grenada and the Equal Employment Opportunity Commission (EEOC) about the alleged harassment. As a pendent state claim, plaintiff advances a cause for intentional infliction of emotional distress, on which defendants request partial summary judgment. The complaint includes a demand for a trial by jury and seeks compensatory and punitive damages. In a motion to strike, defendants assert that if plaintiff prevails on her Title VII claims, she may only recover equitable relief, not monetary damages. Furthermore, they contend, she is not entitled to a jury trial under Title VII.

Besides moving for summary judgment on the state claim, defendants direct their Rule 56 motion to plaintiff's Title VII claims against defendant Ron Morgan, individually; any possible finding of Title VII liability against Morgan, they assert, could only be in his official—not individual—capacity. Both motions are well taken: Defendants' motion for partial summary judgment on the pendent state claim is granted; defendants' motion to strike plaintiff's request for a jury trial and an award of damages, punitive and compensatory, is similarly granted. All of plaintiff's above-described federal claims of sexual harassment and retaliation against municipal defendant Grenada and Ron Morgan, in his official capacity, remain intact for a bench trial before the undersigned on February 8, 1993 in Oxford, Mississippi. Set forth below is the opinion of the court.

### Statement of the Facts

Until health reasons prompted her resignation on September 30, 1991, plaintiff held the job of city clerk for the city of Grenada, Mississippi. She was hired for the position on October 28, 1985. Under the hierarchial scheme of Grenada's city government oper-

ative then, plaintiff, as city clerk, reported to the director of finance, Eddie Ray; Ray, as director of finance, reported to the city manager, a position then held by Jim Turner. In the course of giving deposition testimony, plaintiff acknowledged that she had received a reprimand from Ray while under his supervision and authority. (Pl.'s Dep. at 53.) The reprimand was ultimately removed from plaintiff's personnel file.[1]

Sometime during the period when she was working under Ray, plaintiff composed a memorandum charging him with sexual harassment. The memo was not addressed or sent to anyone in particular. As plaintiff explained in her deposition, "I typed a note, it wasn't to anybody, ... I put my feelings on paper."

The trouble between plaintiff and Ray occurred prior to defendant Morgan's employment with defendant Grenada. During plaintiff's initial two years in the city clerk post, defendant was not even a city employee—Morgan was not employed with defendant municipality until 1987. In fact, for approximately the first four years of her employment as city clerk, plaintiff had no dealings with defendant Ron Morgan. Plaintiff first encountered defendant in her work as city clerk after he became city manager in 1989, the same year the city of Grenada began reorganization of its government. Changes in Grenada's governmental structure eliminated the office of city finance manager; duties and responsibilities of the position were subsequently assigned to the city clerk's office. Reorganization changed the order of reporting; it abolished the position of director of finance; rather than to the director of finance, the city clerk now reported to the city manager. Consequently, defendant Morgan became plaintiff's supervisor.

The two worked amicably together for the initial period of their professional relationship. Rumors circulated in City Hall that the two were carrying on an affair. Aware of these rumors but not the source, plaintiff discussed them with defendant, who likewise knew of the gossip. Shortly thereafter, trouble between them arose when defendant expressed a personal interest in plaintiff.

Defendant first expressed his sentiments for plaintiff one Friday in January, 1990 just after the two had returned from a conference in Jackson, Mississippi. Plaintiff recollects that defendant called her into his office for a conversation. During the exchange, defendant announced that he found plaintiff sexually stimulating; he wondered whether the reverse was true. By plaintiff's recount, defendant stated, "He needed to know how I felt ... to see where we could go from there." (Pl.'s Dep. at p. 66.) Claiming to be sexually excited by the plaintiff, defendant, according to plaintiff's statements in deposition, stated, "You have a way of standing in front of my desk with your hands in your pockets that arouses me ... I cannot get up from my desk when you leave." Plaintiff burst into laughter at the remark, and made her disinterest known. Furthermore, she never wanted to hear him mention the matter ever again. (Pl.'s Dep. at 77.)

Over the weekend, plaintiff became distressed over the Friday incident. When she reported for work the following Monday, she approached defendant in his office, asking him, "What do you expect me to do with that information you gave me Friday?" Defendant reiterated what he had told plaintiff: He needed to make his feelings known to plaintiff; he wanted to know whether the attraction was mutual; and where could they go from there. As she had previously, plaintiff spurned defendant's overtures, stating that she never wanted the matter raised or mentioned anymore. Despite her protests, defendant revisited the subject whenever the two were in conferences or meetings. According to plaintiff, "He wanted to make sure I was okay." (Pl.'s Dep. at 77.) Defendant continually brought up the subject into the spring of 1990. Each time, plaintiff scoffed at his proposals. Meanwhile, their

---

1. The circumstances relating to plaintiff's reprimand concerned misrepresentation of the investment status of certain city monies. Plaintiff gave Ray an investment date of February 17, 1989. Ray later discovered that the funds were not invested until after Monday, February 20, a bank holiday. The four day lag cost Grenada approximately $2,648.

working relationship was quickly deteriorating. In late April, 1990, plaintiff received a poor performance review, which she attributed to her rejection of defendant's propositions. Tensions between the parties mounted as defendant's criticisms continued. Plaintiff accused defendant of being overly critical of her work, calling her deficient and threatening to build a case against her, if she did not quit. In May that same year, plaintiff complained about defendant's treatment of her to the mayor, who suggested that she file a grievance with the city council for sexual harassment, which she ultimately did. Plaintiff filed the first of two formal grievances[2] in September—four months after her discussion with the mayor. The legislative body censured Morgan for poor judgment, but drew no conclusions as to whether he was guilty of sexual harassment.

On or about the time she filed her first grievance in the city council, plaintiff also filed the first of two EEOC complaints.[3] Two months earlier, on or about July 26, plaintiff sought medical treatment for a spastic colon[4] from Joseph Messina, M.D., whom she had been a patient of in 1986.[5] Dr. Messina diagnosed her condition as "irritable bowel syndrome". Messina recommended that plaintiff take a six week medical leave of absence.[6] In April, 1991, Jenkins began taking xanax for stress and anxiety. She sought further medical leave on the advice of her physician. A six week leave was granted in May, and later extended. She never returned to work and tendered her resignation that September.

## LEGAL DISCUSSION

At the onset of its summary judgment analysis, the court disposes of plaintiff's

state claim of extreme emotional distress. The facts, even when reviewed in a light most favorable to plaintiff, fail to suggest conduct that reasonable jurors could characterize as outrageous.

## I. THE PENDENT STATE CLAIM: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Meeting the requisite elements of a claim for intentional infliction of emotional distress is a tall order in Mississippi. The inquiry focuses on the conduct of the defendant rather than the physiological condition of the plaintiff. "[I]t is the nature of the act itself—[not] the seriousness of [its] consequences—[that] gives impetus to legal redress." *Sears, Roebuck & Company v. Devers,* 405 So.2d 898, 902 (Miss. 1981); *McFadden v. State,* 580 So.2d 1210, 1217 (Miss.1991). In fact, a plaintiff may recover damages for the intentional infliction of emotional distress even though no physiological consequences resulted. *Id.* (quoting *Daniels v. Adkins Protective Service, Inc.,* 247 So.2d 710, 711 (Miss.1971).[7] Decisions rendered by the Supreme Court of Mississippi and federal courts sitting in diversity jurisdiction in the Magnolia state on intentional infliction of emotional distress claims consistently turn on whether a plaintiff satisfies the requisite elements set forth in the Restatement (Second) of Torts. To prevail, a plaintiff must demonstrate that the conduct complained of "must evoke outrage or revulsion." *Mitchell v. Random House, Inc.,* 865 F.2d 664, 672 (5th Cir.1989). *See Burris v. South Central Bell Telephone Co.,* 540 F.Supp. 905,

---

2. Plaintiff filed a second formal grievance with the city council in March, 1991, alleging continuing harassment and retaliation.

3. Alleging retaliation from Morgan for filing charges with the EEOC, plaintiff filed a second complaint with the agency on March, 1991.

4. Plaintiff complained of intermittent bouts of diarrhea and constipation.

5. In 1986, Dr. Messina treated plaintiff for angioneurotic edema, a type of allergy. (Messina's Dep. p. 6.)

6. Separate and apart from this lawsuit, plaintiff took a second medical leave of absence from November, 1990 through January, 1991 in connection with surgery for a hysterectomy.

7. In contrast, a medically cognizable physical illness or injury is necessary to prevail on a claim of negligent infliction of emotional distress. Negligent conduct alone does not give rise to a recovery of damages for mental anguish. *Sears,* 405 So.2d at 902.

909 (S.D.Ms.1982) (to give rise to a claim of intentional infliction of emotional distress, conduct must be "extreme and outrageous") (*quoting* Restatement Second, Torts, § 46 comment (d)).

> One who by *extreme and outrageous conduct* intentionally and recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.... [sic] generally, the case is one which the recitation of the fact *to an average member of the community* would arouse as a resentment against the actor, and lead him to exclaim, 'outrageous.' *The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities.*

*Id.* comment (d) (emphasis added). As an adjectival phrase, "extreme and outrageous" is somewhat difficult to define. *Johnson v. Merrell Dow Pharmaceuticals, Inc.*, 965 F.2d 31, 34 (5th Cir.1992). *See Wilson v. Monarch Paper Company*, 939 F.2d 1138, 1142 (5th Cir.1991) ("Extreme and outrageous conduct" escapes precise definition; "case is one in which [ ] recitation of [ ] facts to [ ] average member of [ ] community would lead [citizen] to exclaim, "Outrageous."). It conjures up images of atrocious conduct that breaks "all possible bounds of decency," such that it is "utterly intolerable in a civilized community." *Dean v. Ford Motor Credit Company*, 885 F.2d 300, 306 (5th Cir.1989) (*quoting* Restatement (Second) Torts, § 46, Comment (d)). In the employment context, the Fifth Circuit has repeatedly stated that a claim for intentional infliction of emotional distress will not lie for mere "employment disputes." *Johnson*, 965 F.2d at 33. *See Monarch Paper*, 939 F.2d at 1143 (constructive discharge of employee through creation of unpleasant and onerous work conditions, as deplorable as such conduct sometimes may be, is not the sort of behavior or treatment that constitutes "extreme and outrageous" conduct). Most of the conduct complained of by plaintiff falls into the wide ranging category, "employment disputes": unfair criticism of job performance, poor evaluations, demands that she quit or face the threat of defendant fabricating a case against her to justify termination. Although defendant Morgan's treatment of plaintiff may have been nervewracking, upsetting, and even improper, no reasonable juror could conclude that it rose to the heightened level of "extreme and outrageous." *Johnson*, 965 F.2d at 34. *Compare with Dean*, 885 F.2d at 307 (planting company checks on plaintiff to give appearance she was stealing company money took case out of ordinary realm of employment dispute and into realm of outrageous conduct). Even "draw[ing] all inferences in favor of plaintiff-nonmovant," *Matsushita v. Zenith*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1335–56, 89 L.Ed.2d 538, 552 (1986), the court is of the opinion that plaintiff's state claim cannot survive defendants' motion for partial summary judgment. Rather than a state claim of intentional infliction of emotional distress, the conduct complained of sounds in an action under Title VII, which defendants' motion does not encompass.

## II. THE TITLE VII MATTERS

Federal jurisdiction rests with this court via Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–2 (1981). Before addressing whether jury trials are permissible in the Title VII context, the court takes up the issue of whether, under Title VII, liability extends to an individual defendant.

### A. Individual Liability

Defendants' summary judgment request is properly tailored to cover only the issue of individual liability under Title VII, neither the sexual harassment nor retaliation claim has immediate relevance.[8] The essential thrust of their argument is that defendant Morgan is not an employer by statutory definition and, therefore, is not himself liable for any infringement of plaintiff's federal rights under the civil

---

**8.** Where a defendant's intent and state of mind are at issue in a Title VII action, summary judgment ordinarily is inappropriate. *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991).

rights laws. Section 2000e(b) defines "[t]he term 'employer' [as] a person engaged in an industry affecting commerce ... and any agent of such a person.... Because [defendant Morgan's] liability [if any] under Title VII is premised upon [his] role as agent of the city, any recovery to be had must be against [him] in his official, not his individual, capacity." *Harvey v. Blake*, 913 F.2d 226, 227–228 (5th Cir.1990) (*quoting Clanton v. Orleans Parish School Board*, 649 F.2d 1084 (5th Cir. 1981)). Accordingly, defendants are entitled to summary judgment as to defendant Morgan's individual liability.

B. Defendants' Motion to Strike Plaintiff's Request for: 1) a Jury; and 2) Compensatory and Punitive Damages

1. *Jury Trials and Title VII*

■ With passage of the 1991 Civil Rights Act, which President Bush signed into law on November 21, 1991, discrimination claimants now enjoy the benefit of the right to a jury trial; whereas before, they did not: Title VII simply did not provide civil rights claimants with a right to trial by jury. *See Kozam v. Emerson Electric Co.*, 739 F.Supp. 307, 314 (N.D.Miss.1990), *aff'd.*, 928 F.2d 401 (5th Cir.1991). *See also Collier v. Northland*, No. EC 91–44–D–D (N.D.Miss. May 14, 1990) (Order Striking Jury Demand). Since the new legislation's enactment, however, courts have been grappling with a glaring oversight on the part of Congress;[9] the legislative drafters entirely overlooked the question of

whether the new law applies retroactively.[10] As Judge Posner appropriately phrased it, "[Congress] dumped the [retroactivity] question into the judiciary's lap" with precious little guidance. *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225, 227 (7th Cir.1992).

Contending that the statute applies retroactively, plaintiff attempts to stretch its provisions back to events and occurrences spanning a time frame that predates enactment of the 1991 legislation. In launching this effort, plaintiff recognizes Fifth Circuit holdings to the contrary: "[T]he Act does not retroactively apply to cases arising out of conduct occurring before the Act was enacted." *Valdez v. San Antonio Chamber of Commerce*, 974 F.2d 592, 595 (5th Cir.1992) (*citing Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363 (5th Cir.1992). Nevertheless, she argues, albeit unconvincingly, that retroactive application of the Act turns on whether or not a bench trial has already been conducted. From plaintiff's point of view, the act applies retroactively, unless a nonjury trial has already taken place. In other words, following plaintiff's logic, if no bench trial has been held, then there should be retroactivity, thus entitling her to a jury trial.

As support for her argument, plaintiff cites *Landgraf v. USI Film Products*, 968 F.2d 427 (5th Cir.1992) and *Wilson v. Belmont Homes, Inc.*, 970 F.2d 53 (5th Cir. 1992). *Landgraf* holds that retroactive application should not be given "to allow a

---

**9.** Congressional handling of the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (1991) has been criticized for a host of other perceived blunders, including Congress' effort to limit review of the Act's legislative history when construing § 105(a) of the Statute, codified as 42 U.S.C. § 2000e–2(k), the "disparate impact" doctrine, which emerged from the Supreme Court case, *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The legislative drafters, in composing § 105(b) of the Act directed:

No statements other than the interpretive memorandum appearing at Vol. 137 Congressional Record S 1526 (daily ed. October 25, 1991) shall be considered legislative history of, or relied upon in any way as legislative history in construing or applying, any provision of this Act that relates to Wards Cove-

Business necessity/cumulation/alternative business practice. N.Y.St.B.A. Committee on Federal Legislation, Committee Report: Legislating Statutory Interpretation: The 'Legislative History' Provision of the Civil Rights Act of 1991, 65 N.Y.St.B.J. 44 (January 1993).

**10.** It is worth noting that "Congress passed an explicitly retroactive Civil Rights statute in 1990, which the President vetoed because of what he felt to be 'unfair retroactivity rules.' Congress failed to override the veto. The House then passed another expressly retroactive bill in 1991. A bi-partisan Senate [conference] committee, however, drafted a compromise bill, S. 1745, which deleted the retroactivity provisions. This bill became law." *Rowe v. Sullivan*, 967 F.2d 186 (5th Cir.1992) (quoting 136 Cong.Rec.S. 16562 (daily ed. Oct. 24, 1990)).

jury trial, in a Title VII claim, when ... a bench trial on such claim" was conducted prior to the effective date of the Act; it does not hold the inverse. *Valdez v. San Antonio Chamber of Commerce,* 974 F.2d 592, 595 (5th Cir.1992). Plaintiff is drawing a large inference from *Landgraf* that the court is unwilling to make, given the Fifth Circuit's repeated refusal to apply the Act retroactively. Although it did not specifically decide the retroactivity issue in *Johnson,* 965 F.2d at 1372, the Fifth Circuit Court of Appeals was persuaded by the decisions of three other circuits "that the Act does not apply retroactively...." *See Luddington,* 966 F.2d at 227; *Fray v. Omaha World Herald Co.,* 960 F.2d 1370 (8th Cir.1992); *Mozee v. American Commercial Marine Service, Co.,* 963 F.2d 929 (7th Cir.1992); *Vogel v. Cincinnati,* 959 F.2d 594 (6th Cir.1992). Finding it unnecessary to decide specifically whether the Act's amendments to Title VII apply retroactively, the court "appl[ied] a general presumption against retroactive application of substantive laws[.]" *Johnson,* 965 F.2d at 1372. The presumption rang harmoniously with the Supreme Court's statement that retroactivity is not favored in the law. *See Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) (congressional enactments will not be construed to have retroactive effect unless their language requires it).

While the Fifth Circuit managed to avoid deciding whether the Act applied retroactively to Title VII in *Johnson,* it explored the issue approximately one month later and concluded, "We will not give retroactive effect to the Act's arguably substantive amendments to Title VII." *Rowe,* 967 F.2d at 194.

In denying plaintiff's request, the court is mindful of its earlier decision in *Lynn v. United Technologies,* EC–90–219–D–D (N.D.Miss. January 17, 1992). In *Lynn,* the court formed an initial impression (based on the scarce authority that was available at the time) that retroactivity ap-

plied. It left the question open, however, and invited the parties to further argue the issue. Ultimately, the court stayed further ruling in *Lynn* after being informed that the issue of retroactivity had been certified for interlocutory appeal to the Fifth Circuit by another district court.[11]

Today's action is fully reconcilable with *Lynn.* By no means does the court's order staying one Title VII case, mandate that all other Title VII cases must be stayed as well. *Lynn* was decided in January, 1992 when no Fifth Circuit authority had yet emerged. Since that time, however, the case law has been developing almost daily. Given the strong indications from recent cases in this Circuit and others that the 1991 Act is not retroactive, the interlocutory appeal in *Lynn* would have, in all likelihood, been similarly decided. There has been every indication that the 1991 Civil Rights Act has prospective application only. In the opinion of the undersigned, the prudent approach is to adhere to the steady line of authority flowing from Fifth Circuit pronouncements.

### 2. The Request for Compensatory and Punitive Damages

With respect to plaintiff's request for compensatory and punitive damages, the retroactivity issue is less involved. The Act's allowance of punitive and compensatory damage awards has no retroactive application. Retroactive application of the Act's provisions for recovery of compensatory and punitive damages for conduct predating enactment would result in manifest injustice. *Valdez,* 974 F.2d at 595 n. 2; *Landgraf,* 968 F.2d at 433.

### III. Summary of Defendants' Partial Summary Judgment Request and Motion to Strike Plaintiff's Requests for Jury and Damages in Title VII claims

Having considered defendants' motion, the parties' pleadings, briefs, summary judgment evidence and the record as a whole, the undersigned holds the opinion that the state claim for intentional inflic-

---

**11.** Ultimately, the undersigned entered an order of dismissal with prejudice at the behest of all parties. *Lynn v. United Technologies,* EC 90–219–D–D (October 26, 1992).

tion of emotional distress, and the Title VII suit against defendant Morgan individually may be disposed of summarily. Accordingly, defendants' motion for partial summary judgment relief is granted. In a nonjury case such as the present where the trial judge assumes the role of factfinder, courts " 'may grant summary judgment if trial would not enhance its ability to draw inferences and conclusions.' " *In re Placid Oil Co.*, 932 F.2d 394, 398 (5th Circuit 1991) (*quoting Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1125 (5th Cir.1978). Summary Judgment, therefore, is appropriate in the present matter at this time. Fed.R.Civ.P. 56(c).