BARNES, J.,
 

 for the Court.
 

 ¶ 1. After a work-related maritime injury, Joe Riley sued Ingalls Shipbuilding Inc. (now Northrop Grumman Ship Systems, Inc.); its self-insured claims administrator, F.A. Richard & Associates, Inc. (FARA); and case manager Alexis Hyland (collectively, the Defendants or Appellees) for numerous claims of negligence and intentional tort. The essence of Riley’s complaint was that due to an ex parte meeting between Hyland and Riley’s treating physician, the physician was influenced to give a medical review favorable to the employer regarding Riley’s back injury. The Jackson County Circuit Court granted summary judgment in favor of the Defendants. Finding no error, we affirm the circuit court’s decision.
 

 STATEMENT OF FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. On October 16, 1997, in Pascagoula, Mississippi, Riley sustained a serious maritime industrial injury while working at In-galls Shipbuilding Inc. (Ingalls) when he accidentally fell from an I-beam several feet to the floor and shattered the bones above his left ankle. The following day, emergency surgery was performed on Riley’s lower leg and ankle. After the surgery, while in the hospital, Riley called
 
 *711
 
 “workers comp” at Ingalls to let them know he was in the hospital and to initiate his claim. As a result, on October 21, 1997, while still in the hospital, Riley met with Caty Suthoff, a claims adjuster for FARA. Suthoff received Riley’s permission to tape the conversation, a transcription of which is included in the record before this Court. At the beginning of the interview, Suthoff explicitly stated that she was interviewing him concerning his industrial injury and that she worked for FARA, “representing Ingalls Shipbuilding.” A review of this transcript shows Riley to be quite lucid: he responded appropriately and in detail to questions, providing his badge number, social security number, and other pertinent information quite readily. At this interview, Riley signed a one-page document, which contained a “Medical Authorization,” “Claim Information Release,” and “Choice of Physician Form.”
 
 [1]
 
 The Medical Authorization stated:
 

 I, the undersigned, [Riley], do hereby voluntarily, specifically, and unconditionally authorize any physician, nurse, hospital, or other medical provider,
 
 to furnish, discuss or confer with Ingalls Shipbuilding, Inc., its agents, attorneys, and/or representative, all records and information regarding my past or present physical or emotional condition and treatment rendered therefor.
 
 I further understand that all of my past or present treatment may be relevant and accordingly, consent to the release of all medical information....
 
 Revocation of this document can only be made by myself and only through a written instrument,
 
 signed by me and a representative of Ingalls Shipbuilding, Inc. in whose favor this medical release is granted.
 

 (Emphasis added.) The document was witnessed by Suthoff and signed by Riley in five different places, two of which were for the Medical Authorization.
 
 [2]
 
 It is undisputed that Ingalls voluntarily and properly commenced payment of all pertinent medical and workers’ compensation benefits regarding Riley’s ankle injury until the final adjudication of his Longshore and Harbor Workers’ Compensation Act (LHWCA) claim.
 
 [3]
 

 ¶ 3. After his release from the hospital, on November 3,1997, Riley saw Dr. Christopher Wiggins who took over Riley’s orthopedic treatment.
 
 [4]
 
 On February 12, 1998, Dr. Wiggins found it necessary to perform a subsequent surgery on Riley’s left ankle, a fusion, which left his injured ankle one and one-half inches shorter than the other. Dr. Wiggins opined, after a functional capacity evaluation, that Riley’s date of maximum medical improvement was September 16, 1998, with an impairment rating of fifty percent for his foot.
 

 ¶ 4. In September 1998, Riley retained a law firm in connection with his workers’ compensation case, and shortly thereafter,
 
 *712
 
 one of the firm’s lawyers sent Suthoff a letter asking her to “cease any contact” with Riley. The letter did not address or revoke the Medical Authorization which Riley had signed in October 1997. In March 1999, Riley’s counsel mistakenly filed an application for lump-sum payment with the Mississippi Workers’ Compensation Commission (Commission). Riley’s counsel received a letter from FARA in response, informing him that the Commission did not have jurisdiction over Riley’s claim. Instead, the claim was being handled under the LHWCA, with the U.S. Department of Labor having jurisdiction over the claim.
 
 [5]
 

 ¶ 5. On March 9, 1999, Riley had an office visit with Dr. Wiggins about his custom shoe for his injured foot, when Dr. Wiggins noted for the first time that Riley also complained of back pain. Dr. Wiggins’s medical notes state that: “I was not aware of prior back problems before. [Riley] says he mentioned it to me several times, but apparently no note was made of it. He says all he knows is that his back has been hurting him since the fall and has steadily gotten worse to the point now that he can hardly put up with it.” Upon physical examination and X-rays, Dr. Wiggins noted that Riley had a “very severe limp” and diagnosed him with “spondylolysis L4 possibly aggravated by his industrial injury of 10/16/97 and a severe gait disturbance.”
 
 [6]
 
 Dr. Wiggins summarized that, “[fjrom a workers’ compensation standpoint, the more difficult problem is his back pain .... the man does have a severe gait disturbance and he did sustain a fall[,] both of which are reasonable to have caused the increasing pain from his preexisting, but previously asymptomatic, spon-dylolysis. The workers’ compensation carrier may wish to take this point under advisement.” FARA was provided a copy of these medical notes. These notes were FARA’s first knowledge of any allegation of a back injury related to Riley’s fall.
 

 ¶ 6. On April 19, 1999, Riley saw Dr. Wiggins for “reevaluation.” Dr. Wiggins’s medical notations indicate Riley still complained of back pain. Dr. Wiggins noted that Riley had not worked since the accident in October 1997, and in his estimation, Riley was “fully disabled.” Dr. Wiggins concluded that “[t]his man is disabled for all substantial gainful employment.” Near this comment, there was a handwritten notation that specified “from a social security standpoint.” Dr. Wiggins later explained that he had added this notation after his meeting
 
 [7]
 
 with Hyland, a registered nurse and medical case manager for FAR assigned to Riley’s workers’ compensation case, because it is key language for social security disability, which Riley was attempting to obtain at the time.
 

 ¶ 7. The basis of Riley’s instant lawsuit is Hyland’s June 7, 1999, meeting with Dr. Wiggins. The Appellees’ brief explains that Hyland was employed by FAR for claim consulting with physicians regarding such things as medical injury causation, diagnosis, prognosis, and treatment. Hy-land’s employment notes indicate that she was instructed by FAR to consult with Dr. Wiggins, with the goal of obtaining “approval for jobs, that work restrictions have
 
 *713
 
 not changed, and back problems are not related to work injury to ankle.” Additionally, in a discovery response, she stated that the purpose of her visit with Dr. Wiggins on that day was to present a letter on behalf of FAR claims adjuster Pam Hale to clarify restrictions already assigned by him. Dr. Wiggins also testified that he understood Hyland to be a representative of “FAR, which is the workers’ compensation earner for Ingalls,” and not Riley’s nurse representative.
 

 ¶ 8. Dr. Wiggins, in his medical notes of the June 7 conference with Hyland, stated that his medical note of April 19, 1999, apparently “led to some confusion” as to the back diagnosis of spondylolisthesis, whether it is workers’ compensation related or not, and whether Riley is disabled from substantial gainful employment from a workers’ compensation or social security standpoint. Dr. Wiggins reviewed Riley’s chart and added the handwritten note, discussed above, to the medical notes of Riley’s April 19, 1999 visit, stating Riley is disabled from “a social security standpoint” only. Dr. Wiggins also clarified that Riley’s “spondylolishthesis of L-4 is a preexisting problem and as such is not an industrial injury.”
 

 ¶ 9. Hyland’s notes state that after the June 7, 1999 meeting, Dr. Wiggins concluded Riley’s back problems were not work related. She also stated that Dr. Wiggins was going to review certain job descriptions and specify whether they were still approved for Riley from a workers’ compensation standpoint, but Dr. Wiggins expressed concern that by approving these jobs, Riley might be disqualified from social security disability benefits. Hyland also noted that Dr. Wiggins stated he “did not want claimant to be a ‘burden’ to Ingalls and is trying to take him ‘off their hands’ by helping him get social security.”
 

 ¶ 10. In August 1999, Riley filed a claim under the LHWCA, seeking compensation for both his ankle injury and back problem. Ingalls subsequently controverted the back injury claim in September 1999. In November 1999, Hale sent a letter to Dr. Wiggins asking him to confirm that Riley’s spondylolisthesis was preexisting, not an industrial injury and not aggravated by his industrial injury. In response, on December 8, 1999, Dr. Wiggins wrote a letter to Hale confirming that Riley’s back condition was preexisting to his industrial ankle injury and was in “no way related or aggravated by his industrial injury. The problem [Riley] has with his back is a natural progression of the congenital/developmental spondylolisthesis defect.”
 

 ¶ 11. In June 7, 2000, Riley filed suit in the Jackson County Circuit Court against the Defendants, claiming that Hyland’s ex parte contact with Dr. Wiggins constituted intentional interference with contract, breach of fiduciary duty, intentional interference with prospective advantage, medical malpractice, fraud and misrepresentation, negligence, intentional infliction of emotional distress, intentional interference with medical care and/or breach of confidentiality of physician-patient privilege, intentional interference with medical care by ex parte communication. In his complaint, Riley stated that the Medical Authorization he signed while in the hospital on October 21,1997, was procured when Riley “was disabled and incompetent to waive any medical privilege due to being under the effects of pain medication and being in great pain.” Thus, Riley contends that the Medical Authorization was procured under duress and adhesion, and he was not competent to waive his medical privilege. Later, Riley offered a personal affidavit to this effect stating he was on pain medication, and was not advised that the waiver was a waiver; instead, he was told the
 
 *714
 
 document was necessary in order to obtain medical treatment. Riley sought actual, special, and punitive damages related to the alleged misconduct.
 

 ¶ 12. During Dr. Wiggins’s deposition of June 12, 2000, he recanted his latest opinion on Riley’s back injury and reverted to his original opinion that the fall aggravated Riley’s back injury. Dr. Wiggins specifically stated that he was changing his opinion from his December 8, 1999, statement that Riley’s back problem was preexisting and was in no way related to his industrial injury. Dr. Wiggins testified; “it’s now my opinion that his preexisting spondylolisthesis
 
 was
 
 aggravated as a result of the accident in question.” (Emphasis added.) He explained that the reason he changed his mind was because in December 1999, he probably had not made himself aware of everything in Riley’s record. Dr. Wiggins stated that since Riley had continued to complain of pain in the back after his ankle injury, it was “reasonable to conclude that his underlying spon-dylolisthesis was aggravated by the fall, and if not the fall, certainly [it was] aggravated by his limp.” Regarding his meeting with Hyland on June 7, 1999, Dr. Wiggins stated that it is “not uncommon in workers’ compensation that I’ll be asked to ... interface with a managed care authority.... I do not know what her function was. We went over the case, and I’m sure she asked me some questions, and I ... answered them as best I could. And then after the visit, I make a record of what I think were the important points that came up in discussion.” He maintained that he had never been influenced by Ingalls or any third party regarding his medical opinions.
 

 ¶ 13. In July 2000, the Defendants removed the action to federal court based on diversity jurisdiction, alleging fraudulent joinder of Ingalls, the only non-diverse defendant. In response, Riley filed a motion to remand the case to state
 
 court.
 
 The Defendants filed a motion to dismiss, claiming that Riley’s exclusive remedy was under the LHWCA; therefore, all state law claims were preempted by federal law. The federal district court dismissed Riley’s case with prejudice, and Riley appealed. The United States Court of Appeals for the Fifth Circuit reversed the district court’s decision and remanded the case to state court.
 
 [8]
 

 ¶ 14. On remand to the Circuit Court of Jackson County, in September 18, 2003, the Defendants filed a motion to dismiss the case without prejudice. In the alternative, they moved to stay the proceedings until the resolution of Riley’s underlying claims against Ingalls under the LHWCA or, in the alternative, to grant summary judgment. The circuit court, in granting in part and denying in part the Defendants’ motion, relied upon the Fifth Circuit’s opinion regarding the viability of Riley’s state-law claims that would not be preempted by the LHWCA. The circuit court found that the following of Riley’s claims were independent of the LHWCA and, therefore, would not be stayed pend
 
 *715
 
 ing the resolution of the LHWCA case: intentional interference with contract, medical malpractice, and intentional infliction of emotional distress. All of Riley’s remaining claims were stayed pending the resolution of the LHWCA case before the U.S. Department of Labor.
 
 [9]
 

 ¶ 15. The circuit court lifted the stay of all of Riley’s claims in July 2005, following the resolution of the LHWCA case. After discovery had concluded, on March 28, 2006, the Defendants filed the subject of this appeal, a motion for summary judgment, requesting the court to dismiss all of Riley’s claims as a matter of law.
 
 [10]
 
 At the hearing on the motion, Riley withdrew the claims of breach of fiduciary duty and medical malpractice. On April 3, 2007, the circuit court granted the Defendants’ motion for summary judgment on all of Riley’s claims, finding that Riley has failed to establish the element of malice necessary to support the claims of intentional interference with contoact and intentional interference with prospective advantage. Further, the court found no genuine issue of material fact of any misrepresentation by Hyland to support a claim for fraud and misrepresentation, no evidence to support the claim of negligence, and no acts sufficient to support the claim for intentional infliction of emotional distress. The court addressed together the claims for intentional interference with medical care and breach of confidentiality with physician/patient privilege and intentional interference with medical care by ex parte communication, and it held that any such claim would require at least identification of proximate cause and damages. Finding that Riley had not created a genuine issue of material fact as to either element, the court granted summary judgment in favor of Defendants.
 

 STANDARD OF REVIEW
 

 ¶ 16. This Court reviews a trial court’s grant of summary judgment de novo.
 
 Webb v. Braswell,
 
 930 So.2d 387, 395(¶ 12) (Miss.2006) (citing
 
 Monsanto Co. v. Hall,
 
 912 So.2d 134, 136(¶ 5) (Miss.2005)). The “admissions in pleadings, answers to interrogatories, depositions and affidavits,” among other items, properly before the trial court, will be reexamined by this Court in order to determine if there is any genuine issue of material fact.
 
 Webb,
 
 930 So.2d at 395(¶ 12) (citing
 
 McCullough v. Cook,
 
 679 So.2d 627, 630 (Miss.1996)). “If no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment should be entered in that party’s favor.”
 
 Id.
 
 We review the evidence in the light most favorable to the non-moving party.
 
 Id.
 
 (citing
 
 Stallworth v. Sanford,
 
 921 So.2d 340, 341(¶ 5) (Miss.2006)).
 

 
 *716
 
 ANALYSIS
 

 ¶ 17. The law of summary judgment is well known. “The movant carries the burden of demonstrating that no genuine issue of material fact exists, and the non-moving party is given the benefit of the doubt as to the existence of a material fact.”
 
 Webb,
 
 930 So.2d at 395(¶ 12). To withstand summary judgment, the party opposing the motion must present sufficient proof to establish each element of each claim “on which he would bear the burden of proof at trial.”
 
 Galloway v. Travelers Ins. Co., 515
 
 So.2d 678, 684 (Miss.1987). The party opposing summary judgment must be diligent.
 
 Grisham v. John
 
 Q.
 
 Long V.F.W. Post No. 4057, Inc.,
 
 519 So.2d 413, 415 (Miss.1988) (citing
 
 Smith v. H.C. Bailey Cos.,
 
 477 So.2d 224, 233 (Miss.1985)). He “may not rest upon allegations or denials in [his] pleadings”; rather, he but must set forth specific facts through an affidavit or otherwise showing that there is a genuine issue for trial.
 
 Fruchter v. Lynch Oil Co., 522
 
 So.2d 195, 198-99 (Miss.1988). Contested fact issues in the record do not necessarily allow a party to avoid summary judgment; “[t]he court must be convinced that the factual issue is a material one, one that matters in an outcome determinative sense.”
 
 Leffler v. Sharp,
 
 891 So.2d 152, 156(¶ 9) (Miss.2004) (quoting
 
 Simmons v. Thompson Mach. of Miss., Inc.,
 
 631 So.2d 798, 801 (Miss.1994)).
 

 1. Intentional Intetfereuce with Contract and Intentional Interference ■with Prospective Advantage
 

 ¶ 18. While Riley raises these claims as two separate causes of action, we find the circuit court properly addressed them together, and we shall do the same. In analyzing these claims, the circuit court reasoned that Riley failed to establish the element of malice necessary to support them. The circuit court explained that malice was not established due to the limited applicability of a medical privilege in state or federal workers’ compensation cases, the course of conduct allowing the Defendants access to all of Riley’s medical treatment, and the fact the Defendants possessed “an otherwise valid and unconditional waiver” from Riley.
 

 ¶ 19. Malice is a requirement for both tortious interference with contract and intentional interference with prospective advantage.
 
 See, e.g., Par Indus., Inc. v. Target Container Co.,
 
 708 So.2d 44, 48(¶ 8) (Miss.1998) (citing
 
 Cenac v. Murry,
 
 609 So..2d 1257, 1268-69 (Miss.1992)) (to constitute intentional interference with contract, the acts must have been “done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice)”);
 
 MBF Corp. v. Century Business Commc’ns,
 
 663 So.2d 595, 598 (Miss.1995) (citing
 
 Nichols v. Tri-State Brick and Tile,
 
 608 So.2d 324, 328 (Miss.1992)) (for intentional interference with prospective advantage, also known as tor-tious interference with a business relationship, the acts must have been “done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice)”).
 

 ¶ 20. The intent of the actors is important in both of these claims. In the instant case, the Defendants’ actions do not establish malicious intent because Riley executed a facially valid waiver. The Defendants were operating under the intent that the meeting with Hyland was proper, as Riley had waived his physician/patient privilege. The circuit court noted that the parties had been operating pursuant to the medical waiver for almost two years without objection prior to the ex parte contact between Hyland and Dr. Wiggins. The circuit court found there to
 
 *717
 
 be no genuine issue of material fact that the Defendants knew or should have known of any invalidity in the Medical Authorization.
 

 ¶ 21. Riley argues that the circuit court erred in holding the Medical Authorization signed by Riley to be a “valid and unconditional waiver” of his medical privilege. Riley states there is a jury issue regarding the validity of the waiver. The circuit court found no such genuine issue of material fact, and we agree.
 

 ¶ 22. Riley claims he did not initiate the hospital meeting with Suthoff on October 21, 1997, when the Medical Authorization was signed. However, earlier testimony contradicts his later contention.
 
 [11]
 
 Riley did not complain of Suthoff s visit until this lawsuit was initiated.
 

 ¶ 23. Riley argues he was incompetent to sign the Medical Authorization; therefore, it is invalid. He points to his affidavit, made six years after the meeting, as proof of this before the circuit court. In the affidavit, he claimed that he was in great pain after his first surgery and heavily medicated with narcotics. He also claims the FAR representative (Suthoff) misrepresented to him the purpose of the form — permission for hospital treatment, not workers’ compensation issues — and nobody told him the form contained a waiver of the physician-patient privilege. Finally, he claims further proof of incompetence was that he signed the Medical Authorization in five
 
 [12]
 
 different places, two of which he signed instead of dated.
 

 ¶ 24. We find contract law applicable for the analysis of Riley’s execution of the Medical Authorization. Mississippi law has a presumption of sanity and mental capacity regarding entrance into a contract.
 
 Frierson v. Delta Outdoor, Inc.,
 
 794 So.2d 220, 224(¶ 8) (Miss.2001) (citing
 
 Foster v. Wright,
 
 240 Miss. 566, 572, 127 So.2d 873, 876 (1961)). The burden of proof for mental incapacity falls on the party seeking to avoid the contract, which must be established by a preponderance of proof.
 
 Id.
 
 The mere ingestion of drugs that have the potential to affect a person’s mind is “not sufficient to raise the presumption of incapacity”; instead, the signator’s “capacity must be judged within the context of his actions at the time” of execution.
 
 Richardson v. Langley,
 
 426 So.2d 780, 784-85 (Miss.1983).
 

 ¶25. The transcription of the October 21, 1997, meeting between Suthoff and Riley raises no question of Riley’s incompetency at the time; instead, the transcription shows he was quite alert, regardless of whether Riley was in the hospital and on pain medication at the time.
 
 [13]
 
 Suthoff asked Riley’s permission to tape record their conversation, and he assented, as is clearly stated in the transcription of the meeting.
 
 [14]
 
 Riley answered every question
 
 *718
 
 Suthoff posed clearly and succinctly, and he was able to provide specific, detailed information about everything from his social security and badge number to his work history, job title, education, driver’s license, names of superiors, and details about his industrial injury. While Riley did sign the Medical Authorization twice (once where he should have dated it), we do not find this sufficient to raise a question of mental incompetence.
 

 ¶ 26. The Defendants also provided a letter from Dr. William George, a professor of pharmacology and director of toxicology at Tulane University Medical Center, in their exhibits attached to their motion for summary judgment. In a letter of May 2004, Dr. George opined, from examining Riley’s medical records, that there was no “evidence of untoward effects” of any of the medications Riley was on at the hospital at the time he signed the Medical Authorization. Riley offered no contrary medical evidence.
 

 ¶ 27. Riley’s argument about misunderstanding what he was signing also fails, as he had a legal duty to read what he was signing. “[A] party may neither neglect to become familiar with the terms and conditions and then later complain of lack of knowledge, nor avoid a written contract merely because he or she failed to read it or have someone else read and explain it.”
 
 Bailey v. Estate of Kemp,
 
 955 So.2d 777, 783(¶ 22) (Miss.2007) (quoting
 
 MS Credit Center, Inc. v. Horton,
 
 926 So.2d 167, 177(¶ 31) (Miss.2006)). Riley also had the intellectual and educational capacity to understand the Medical Authorization, as he is a high school graduate and has some college education.
 

 ¶ 28. Further, an examination of the waiver does not show it to be invalid on its face, as Riley contends. At oral argument, Riley’s counsel claimed Ingall’s Medical Authorization was unusual in that it authorizes the medical service provider to “furnish, discuss or confer” with Ingalls regarding the claimant’s medical conditions. We fail to see how this language is unusual. In order for Ingalls to investigate Riley’s workers’ compensation claim under the LHWCA, it is necessary for them to have ready access to Riley’s medical records and confer with the appropriate parties. Dr. Wiggins testified that it was “not uncommon in workers’ compensation [cases] that [he would] be asked to ... interface with a managed care authority.”
 

 ¶ 29. We also note that at no time did Riley revoke the Medical Authorization, even after his counsel sent a letter to Suthoff in September 1998 telling her to cease all contact with Riley. Riley argues this fact is irrelevant, but we find it relevant to the issue of waiver, especially as the authorization specifically states how its revocation may be made. Riley also raises whether or not this Medical Authorization even granted Hyland ex parte contact with Dr. Wiggins. We find it did, as Hyland was a representative of Ingalls under the language of the form. Therefore, for the nearly two years from the date of the accident to the notice of controversion of Riley’s LHWCA claims, FAR and Ingalls were operating under a facially valid Medical Authorization which gave them the right to access Riley’s medical records and confer with his physicians in order to administer his workers’ compensation benefits properly. Riley provides no evidence to the contrary, except his affidavit taken six years after-the-fact that he was incompetent and failed to read what was placed before him. We find, as did the circuit court, that this is insufficient to create a
 
 *719
 
 genuine issue of material fact regarding the validity of Riley’s waiver of his physician-patient privilege.
 

 2. Fraud, and Misrepresentation, Negligence, and Intentional Infliction of Mental Distress
 

 ¶ 30. Riley’s complaint alleges that Hyland misrepresented herself to Dr. Wiggins as an advocate in the best interest of Riley when in fact she was a “lobbyist” for the Defendants. “The elements of fraud, which must be proven by clear and convincing evidence, include: 1) a representation; 2) its falsity; 3) its materiality; 4) the speaker’s knowledge of its falsity or ignorance of its truth; 5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; 6) the hearer’s ignorance of its falsity; 7) his reliance on its truth; 8) his right to rely thereon; and 9) his consequent and proximate injury.”
 
 In re Estate of Law; Cluney v. Laid,
 
 869 So.2d 1027, 1029(¶ 4) (Miss.2004) (quoting
 
 Levens v. Campbell,
 
 733 So.2d 753, 761-62(¶ 35) (Miss.1999)).
 

 ¶ 31. The circuit court held that the claim for fraud or misrepresentation failed because the allegation made by Riley in his complaint — Hyland misrepresented herself to Dr. Wiggins — was denied by competent evidence of both Hyland and Dr. Wiggins. We agree. Riley does not offer any evidence in dispute of Hyland’s and Dr. Wiggins’s representations, and he does not address this claim specifically in his brief. Accordingly, we affirm the circuit court’s dismissal of this claim.
 

 ¶ 32. Regarding Riley’s claim for negligence, he alleges that the Defendants negligently interfered with his medical care. Riley must prove duty, breach, causation, and damages, as required for a negligence claim.
 
 See Fisher v. Deer,
 
 942 So.2d 217, 219(¶ 6) (Miss.Ct.App.2006) (citing
 
 Couch v. City of D’Iberville,
 
 656 So.2d 146, 150 (Miss.1995)). The circuit court held that there was no evidence to support this claim, and we agree. Riley does not discuss this claim in his briefs. Accordingly, it is deemed abandoned.
 

 ¶ 33. Finally, Riley claims the actions of Defendants caused him severe mental and emotional distress and anguish. Riley must establish that the Defendants’ conduct through this ex parte meeting was wanton and willful and evoked outrage or revulsion.
 
 See Speed v. Scott,
 
 787 So.2d 626, 630(¶ 17) (Miss.2001) (citing
 
 Leaf River Forest Prods., Inc. v. Ferguson,
 
 662 So.2d 648, 659 (Miss.1995)). Generally, “meeting the requisites of a claim for intentional infliction of emotional distress is a tall order in Mississippi.”
 
 Id.
 
 at (¶ 19) (quoting
 
 Jenkins v. City of Grenada,
 
 813 F.Supp. 443, 446 (N.D.Miss.1993)). The severity of the acts must be “so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.”
 
 Id.
 
 at (¶ 18) (quoting
 
 Pegues v. Emerson Elec. Co.,
 
 913 F.Supp. 976, 982 (N.D.Miss.1996)). The circuit court found no such acts, and we agree. In his brief, Riley merely states “[t]here is certainly a jury question” regarding this claim, but he offers no evidence in response to the circuit court’s opinion that would rise to the level required to support the claim. Accordingly, we affirm the circuit court’s dismissal of these claims.
 

 3. Intentional Interference with Medical Care and/or Breach of Confidentiality of Physician/Patient Privilege, and Intentional Interference with Medical Care by Ex Parte Communications
 

 ¶ 34. The parties focused the majority of their attention on these claims. Riley contends that “[t]he main question presented by this appeal is whether the court should allow a jury to consider a
 
 *720
 
 cause of action against a third party who wantonly and callously violates the doctor-patient privilege.” Riley argues this is an issue of first impression and requests this Court to fashion a cause of action entitled “intentional interference with medical care by ex parte communication” or “breach of confidentiality of physician-patient privilege.”
 
 [15]
 
 The Appellees respond that “[t]he sole issue of concern ... is whether in the context of the LHWCA, ex parte communications between the employer/insurance carrier and a treating physician create a cause of action in tort under Mississippi or state law against the employer/insurance carrier for violation of the physician-patient privilege.”
 
 [16]
 
 Neither address, to any significant extent, the trial court’s determination that there was no genuine issue of material fact as to any causation or damages as a result of the Defendants’ ex parte contact. The court found no evidence that Riley’s treatment was denied, delayed, or interfered with as a result of the ex parte contact. More importantly, however, we note that none of the authorities cited by Riley would suggest that a facially valid medical authorization form such as the one in this case would be ineffective to waive the physician-patient privilege.
 
 [17]
 
 As previously discussed, we affirm the circuit court’s conclusion that there is no genuine issue of material fact regarding the validity of the Medical Authorization. Certainly, the Defendants’ actions under the authority of the Medical Authorization could not have “wantonly and callously violate[d] the doctor-patient privilege” as argued by Riley. Thus, we find the trial court’s grant of summary judgment was appropriate.
 

 A
 
 Defendants’ Second Motion for Summary Judgment
 

 ¶ 35. On September 18, 2003, the Defendants filed a motion with the circuit court styled “Motion to Dismiss or Stay Proceedings or to Grant Summary Judg
 
 *721
 
 ment.” The motion did not address summary judgment until the last sentence, and then it only stated “[i]n the alternative, [the] Defendants request Summary Judgment.” In this motion, the Defendants did not challenge the sufficiency of the evidence as laid out in Mississippi Rule of Civil Procedure 56. Then, on March 28, 2006, the Defendants filed a “second” motion for summary judgment attacking the sufficiency of the evidence. At the hearing on this motion, Riley’s counsel objected that this second motion was improper based on waiver, estoppel, and res judica-ta, but the judge found no such error.
 

 ¶ 36. Riley argued that the “Mississippi Rules of Civil Procedure do not permit multiple motions for summary judgment,” but he did not specifically cite a rule to support his contention. Rule 56(a) does not limit the number of summary judgment motions but states that “[a] party ... may, at any time ..., move ... for a summary judgment.” Procedurally, we note that the circuit court granted in part and denied in part the defendants’ “first” motion to dismiss or stay the proceedings, but the court never ruled on the alternative motion for summary judgment, nor was it argued at this motion’s hearing. We find no error with the Defendants filing a “second” motion for summary judgment.
 

 ¶ 37. THE JUDGMENT OF THE CIRCUIT COURT OF JACKSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, ROBERTS AND CARLTON, JJ., CONCUR. ISHEE, J., NOT PARTICIPATING.
 

 [1]
 

 . The Medical Authorization appeared at the top of the page; the Claim Information Release was in the middle of the page, and the Choice of Physician Form was at the bottom of the page. Each section had a separate space for signature and date.
 

 [2]
 

 . We note Riley did sign the Medical Authorization in one place where he should have dated it instead.
 

 [3]
 

 . Since Riley was engaged in the maritime industry of ship building, his workers' compensation claims are governed by the provisions of the LHWCA Act, 33 U.S.C. § 901 (2006), and not the Mississippi Workers’ Compensation Act.
 

 [4]
 

 . In his deposition, Dr. Wiggins stated he is a board-certified orthopedic surgeon with over twenty years experience with workers' compensation claims, and "the workers' compensation [carrier! for Ingalls wanted me to follow their patients.”
 

 [5]
 

 . Because of this fact, in May 1999, Riley’s retained law firm ended its association with him. Riley did not obtain new counsel until July 7, 1999, when he hired his current counsel.
 

 [6]
 

 . Dr. Wiggins described "spondylolysis” as "a crack in the vertebra in the lower back.” He also calls the condition "spondylolisthesis,” which he states "is basically just about the same thing .... a crack with some slippage where the vertebra slides forward as a result of the crack.”
 

 [7]
 

 . Riley was not given notice of this meeting.
 

 [8]
 

 . The Fifth Circuit determined that the federal court lacked both federal question and diversity jurisdiction over the case. The court held that the Defendants’ LHWCA defense to Riley’s state-law claims was insufficient to create federal question jurisdiction. Likewise, the court held that since Riley’s state-law claims are based on "the Defendants' close relationship with [Dr. Wiggins] and the Defendants' alleged interference with Riley’s medical treatment,” at least one of Riley's claims, intentional interference with contract, appeared to be independent from his entitlement to LHWCA benefits and might entitle Riley to prevail on the merits; accordingly, Ingalls had not been fraudulently joined to defeat diversity jurisdiction. While the Fifth Circuit recognized that some of Riley's claims would be preempted by the LHWCA, the court did not identify them in its opinion.
 

 [9]
 

 . A hearing was held on Riley’s LHWCA claims at the U.S. Department of Labor on May 2004. We note that when Riley’s counsel attempted to argue that this proceeding had to resolve whether there was a medical privilege under the LHWCA and whether a worker is competent to waive that privilege, the administrative law judge specifically stated that he did not find these issues relevant as to whether or not Riley is entitled to medical compensation, which was the issue before him, and declined to consider the issues.
 

 In August 2004, the U.S. Department of Labor rendered an order whereby Riley was awarded temporary total disability benefits until his maximum medical improvement date of September 16, 1998, and thereafter Riley was awarded permanent partial disability reduced by Riley's residual earning capacity. This permanent partial disability award is what Riley claims the Defendants sought tor-tiously to influence by their contact with Dr. Wiggins.
 

 [10]
 

 . This motion was actually the Defendants' second motion for summary judgment; their first motion was styled "in the alternative” to their motion to dismiss or stay the proceedings on September 18, 2003.
 

 [11]
 

 . In the proceedings in May 2004 at the U.S. Department of Labor for Riley's LHWCA claim, when asked if Suthoff called and asked permission to come see Riley in the hospital, he answered: "I really don't know, I might have called her and told-well,
 
 I did call her and told her, I called Workman’s Comp at West Bank and I told them that I was in the hospital, and that's what I did."
 
 (Emphasis added.)
 

 [12]
 

 . Riley did sign the one-page document five times, but three of those signatures were on the "Claim Information Release” and the "Choice of Physician” forms, also contained on the same page as the "Medical Authorization.”
 

 [13]
 

 . Riley signed the Medical Authorization at the beginning of their meeting; however, this portion of the meeting was not tape recorded and, therefore, not in our record.
 

 [14]
 

 . We note that Riley claims he was never provided a copy of the cassette tape or transcription of this meeting; however, the Appel-lees state the cassette tape itself was made an
 
 *718
 
 exhibit at the LHWCA hearing of May 2004, and the transcript was also made available and exhibited at the hearing. Furthermore, the transcription is attached as an exhibit to the Defendants' motion for summary judgment.
 

 [15]
 

 . In addition to authorities cited in Daniel P. Jones, Annotation
 
 “Discovery: Right to Ex Parte Interview with Injured. Party’s Treating Physician,"
 
 50 A.L.R.4th 714 (1986 & Supp. 2008), Riley relies upon section 13-1-21 of the Mississippi Code Annotated (Rev.2002) and
 
 Scott ex rel. Scott v. Flynt,
 
 704 So.2d 998 (Miss.1996) in support of his request that this Court announce a cause of action against those who initiate or participate in violation of the physician-patient privilege by ex parte contact with medical-care providers. Section 13-1-21 declares all communications made to a physician by a patient is privileged and makes the physician "civilly liable for damages for any willful or reckless and wanton acts or omissions” constituting willful violation of the privilege. In
 
 Scott,
 
 the Mississippi Supreme Court recognized the "paramount importance” of the patient’s privilege of medical confidentiality and declared it "must be afforded protection.”
 
 Scott,
 
 704 So.2d at 1004. Accordingly, the
 
 Scott
 
 court reversed a trial court's order requiring a medical malpractice plaintiff to execute an unconditional waiver of her medical privilege.
 
 Id.
 
 at 999.
 

 [16]
 

 . The Defendants primarily contend that there is no legally cognizable physician-patient privilege under federal law which governs this LHWCA claim. They cite as the "most compelling evidence” the exclusion of LHWCA claims from the privacy protection of the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320(d) (2006)
 
 et seq.
 
 The Department of Health and Human Services explained that under the final regulation, "a covered entity may disclose protected health information regarding an individual to a party responsible for payment of workers’ compensation benefits.... For purposes of this paragraph, workers’ compensation benefits include benefits under programs such as ... the Longshore and Harbor Workers’ Compensation Act.” 65 Fed.Reg. 82462, (discussing "Section 164.512(Z) — Disclosures for Workers' Compensation”).
 

 [17]
 

 . In fact, in
 
 Scott,
 
 the Mississippi Supreme Court held inadmissible "evidence obtained from ex parte contacts,
 
 without prior patient consent." Scott,
 
 704 So.2d at 1007 (emphasis added).